# Wytheville.

## SOUTHERN RAILWAY COMPANY v. WILCOX & DeJARNETTE.

### JUNE 20, 1901.

Absent, Keith, P.

1. PLEADING—*Contracts—Offer and Acceptance—Reasonable Time.*—In an action for damages for failure to carry goods at a rate agreed, an averment in the declaration that the plaintiff delivered the goods for shipment as he had agreed to do is a sufficient averment that the goods were furnished within a reasonable time after making the contract.

2. PLEADING—*Contracts—Offer and Acceptance—Withdrawal.*—An averment in a declaration that an offer of the defendant was accepted by the plaintiff necessarily implies that the offer had not been withdrawn.

3. PLEADING—*Illegality of Consideration—General Issues.*—Illegality of consideration may be shown under the general issue in *assumpsit* on a simple contract.

4. PLEADING—*General Issues—Special Pleas.*—The rejection of special pleas is not ground of error where the defendant has been allowed to give in evidence the same matter under the general issue.

5. EVIDENCE—*Contracts—Letters Written after Breach—Res Gestæ.*—Letters written long after a contract has been broken, which contain mere statements of one party's view of the differences between the parties, and the expression of a desire to have them adjusted, constitute no part of the *res gestæ*, and are not admissible in evidence in an action to recover damages for a breach of the contract.

6. EVIDENCE—*Contracts—Other Collateral Contracts—Carriers.*—In an action against a carrier for an alleged breach of contract to carry goods at an agreed rate, the contracts for sale of the goods made by the shipper to third persons, based on the rate agreed, but to which the carrier was not a party, and of which it had no knowledge until after they were made, are not admissible in evidence. Such contracts do not tend to prove the making of the contract in suit.

7. INSTRUCTIONS—*Evidence to Support—Weight of Evidence—How Tested.*— If there is any evidence tending to prove a fact in issue before a jury, it is proper for the court to give an instruction applicable thereto, if requested so to do, even though it is so slight as to be insufficient to support a verdict founded upon it. If the opposing party desires the court to pass on the sufficiency of the evidence, this must be done either by a demurrer to the evidence before verdict, or, after verdict, by a motion to set aside the verdict.

8. CONTRACTS—*Acceptance—When Question for Jury.*—Whether an offer has been accepted in a reasonable time, is, in cases of doubt, a question for the jury.

9. CONTRACTS—*Consideration—Carriers.*—The mutual obligations of a shipper to ship, and of a carrrier to carry, furnish sufficient consideration for a contract to carry at a specified rate, but if the shipper fails to accept the carrier's offer, and is not bound to furnish the goods for carriage, the carrier's offer or promise to carry for a particular rate becomes a mere *nudum pactum*, the breach of which will not support an action.

10. EVIDENCE—*Records—Examined Copies—Certified Copies—Code, Sec. 3343.*—One of the usual methods of proving records is by examined copies. The method prescribed by section 3343 of the Code is merely cumulative, and does not deprive parties of the right to resort to any other method allowable at common law.

11. CONTRACTS—*Illegality—Interstate Commerce Act.*—The general rule that a contract made in violation of law is void, and that no recovery can be had upon it, applies to contracts made in violation of the Interstate Commerce Law.

12. CONTRACTS—*Interstate Commerce Act—Lowering Rates—Restoration.*— Lowering a freight rate in the manner required by the Interstate Commerce Act, after a contract has been made in violation of that act, does not render the contract valid and binding on the carrier, and, if under no legal obligation to lower the rate, the carrier may restore the rate so lowered.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, rendered June 28, 1900, in an action of *assumpsit*, wherein the defendants in error were the plaintiffs, and the plaintiff in error was the defendant. Judgment was rendered for the plaintiffs for $1,747.87, the amount claimed by them.

*Reversed.*

This case was formerly before this court on the ruling of the trial court on the demurrer to the declaration. 98 Va. 222.

This is an action of *assumpsit* to recover damages for the breach of an alleged contract to carry freight at a stipulated rate. The plaintiffs claimed that the defendant company had agreed to transport three thousand tons, of 2,240 pounds each, of phosphate rock from Mt. Pleasant, Tenn., to Raleigh, N. C., at the price of $3.37 a long ton. The defendant resisted the claim on the ground that no such contract was ever made; that there was no consideration for the contract, if any such was made; that the alleged contract lacked mutuality; that the rock had not been furnished for shipment in a reasonable time; and that, if any such contract was proved, it was void because forbidden by the Interstate Commerce Act.

The case as made out by the plaintiffs' evidence, was substantially as follows:

J. H. Carpenter & Co. owned a quarry of phosphate rock at Mt. Pleasant, Tenn., the product of which they desired to put upon the market. A member of the firm residing in Norfolk applied to Wilcox & DeJarnette, brokers of the city of Norfolk (hereinafter called the plaintiffs) to aid them in effecting sales, and agreed with them upon a price for the rock. In January or February, 1897, the plaintiffs applied to several railroad companies for rates on the rock from Mt. Pleasant, Tenn., to Norfolk, Va., Richmond, Va., and Raleigh, N. C. The Norfolk and Western, the Chesapeake and Ohio, and the Southern (hereinafter called the defendant) gave rates of $3.30 a ton to Norfolk, Va., and to Richmond, Va., and the defendant gave a rate of $3.37 per ton of 2,240, to Raleigh, N. C. The rates given by the defendant were furnished by E. T. Lamb, the representative of the defendant in Norfolk, who says that he was authorized by his superior officer to give that rate. A few days after this rate was given, one of the plaintiffs went to Raleigh, N. C., and negotiated a sale of 3,000 long tons of rock at a price based on

the said freight rate. As soon as he returned to Norfolk he informed Lamb of the sale, and the latter said he was glad to hear it, but regretted that he had not sold 5,000 tons. Under the terms of the sale negotiated in Raleigh, the rock was to be weighed and inspected there, and was to conform to representations as to its quality, or else the purchasers were not obliged to take it. The plaintiffs did not specifically agree to ship any quantity of rock, but notified Lamb of the sale, and in April following began making shipments. Although the rate quoted was $3.37 a long ton, the rate actually charged was $3.61 a ton of 2,000 pounds, which was the published rate under the Interstate Commerce Act. This led to complaint, and an investigation, which finally resulted in the refunding to the plaintiffs by the defendant of the excess of freight charged. In the meantime, the defendant had procured the initial carrier's consent to reduce the rate to that which it had quoted, and accordingly that rate was duly promulgated in accordance with the Interstate Commerce Act, July 22, 1897. This rate continued in force till November 16, 1897, when the old rate was restored in the manner required by the Interstate Commerce Act.

No rock was shipped from July 23, 1897, till December 13, 1897, during a part of which time the controversy was going on over the freight rate, but thereafter and until August 31, 1898, the plaintiffs continued to make shipments. It was also claimed by the plaintiffs that the defendant failed to furnish cars promptly for the transportation of the rock. The aggregate of all the shipments was 3,278 short tons. On all shipments after November 16, 1897, the defendant charged freight at the rate of $3.61 a short ton. The defendant claimed that the rate had been given by mistake; that it had no right to charge less than the published rate; and that, there being no contract binding on it, it had the right to restore the rate published in the first instance. There was no dispute as to the amount claimed by the

plaintiffs, but the defendant denied all liability for any amount whatever, and hence this action.

After all the evidence was in, the plaintiffs and the defendant, respectively, offered instructions as follows:

### *Plaintiffs' Instructions No. 1.*

"The court instructs the jury that if they believe from the evidence that the defendant offered to transport for the plaintiffs three thousand or about three thousand tons of phosphate rock from Mount Pleasant, Tenn., to Raleigh, N. C., at the rate of $3.37 per ton of 2,240 pounds, and that *the plaintiffs accepted said offer before a withdrawal of the same by the defendant* (if the jury should believe from the evidence that there was such withdrawal), then such offer and acceptance constituted a contract binding upon the parties; and if the jury believe from the evidence that the plaintiffs furnished and delivered the said amount of phosphate rock to the defendant within a reasonable time under all the facts and circumstances of the case for transportation as aforesaid, then the defendant was bound to transport the same at the said rate of $3.37 per ton of 2,240 pounds."

### *Plaintiffs' Instructions No. 2.*

"The court instructs the jury that if they believe from the evidence that the defendant offered to transport for the plaintiffs phosphate rock from Mount Pleasant, Tenn., to Raleigh, N. C., at the rate of $3.37 per ton of 2,240 pounds, and that the plaintiffs accepted said offer for 3,000 or about 3,000 tons of phosphate rock before a withdrawal of said offer by the defendant (if the jury should believe from the evidence that there was such withdrawal), then such offer and acceptance constituted a contract binding upon the parties; and if the jury believe from the evidence that the plaintiffs furnished and delivered the said amount of phosphate rock to the defendant within a reasonable

time, under all the facts and circumstances of the case, for transportation as aforesaid, then the defendant was bound to transport the same at the said rate of $3.37 per ton of 2,240 pounds."

### *Plaintiffs' Instructions No. 3.*

"The court instructs the jury that the question of reasonable time for the delivery of the 3,000 tons of fertilizer, or thereabouts, for shipment, is one for the jury to determine, under all the facts and circumstances of this case, and that the plaintiffs were not called upon to make any effort to expedite the delivery of the fertilizer for shipment after November 16, 1897, if the jury believe from the evidence that the defendant increased the rate of freight on that date in violation of the plaintiffs' rights at that time."

### *Defendant's Instructions No. 1.*

"The court instructs the jury that in considering what was a reasonable time in which the rock should have been offered for shipment by the plaintiffs, they cannot allow more than one year from the 13th of April, 1897, the time when the first shipment was made, and they cannot allow any damages for charges over and above $3.01 on shipments made after the 13th of April, 1898."

### *Defendant's Instructions No. 2.*

"The court instructs the jury that unless they believe from the preponderance of the evidenc that Mr. Wilcox promised Mr. Lamb, agent of the defendant, to ship about 3,000 long tons of rock over the Southern railway from Mount Pleasant to Raleigh at the rate of $3.37, they should find their verdict for the defendant."

### *Defendant's Instructions No. 3.*

"The court instructs the jury that if they believe from the evi-

dence that the plaintiffs asked the agents of the defendant company in January, 1897, to name them a rate of freight on phosphate rock from Mt. Pleasant to Raleigh, saying they thought they could work some business over the road, and that the defendant, in February, 1897, named a rate of $3.01 per short ton, and that afterwards the paintiffs made a contract with the phosphate mining company to deliver at Raleigh about 3,000 tons of the rock, and that the plaintiffs afterwards notified the agents of the defendant company that they had made the contract with the phosphate mining company, and had routed the rock by the Southern railway, and that the plaintiffs never promised the agents of the defendant to furnish to the company 3,000 tons or any other number of tons of freight, and that the defendant did ask the plaintiffs to give it some freight from Mount Pleasant to Raleigh, but did not ask the plaintiffs to make the contract which they made with the mining company; that these facts and circumstances did not make a contract binding on the defendant for the reason that the plaintiffs did not bind themselves to the company thereby, and the company had the right to change the rate; and if the jury further believe from the evidence that the rate was advanced in November to $3.61, after proper notice of ten days, and that the balance of the 3,000 tons was hauled on the advanced rate, the plaintiffs cannot recover in this action, and the jury should find for the defendant."

*Defendant's Instructions No. 4.*

"The court instructs the jury that if they believe from the evidence that at the times when the charges of $3.61 per ton on the rock from Mount Pleasant to Raleigh were made by the defendant, .60 per ton of which this suit is brought to recover back, the tariff rate published at Mount Pleasant and filed with the Interstate Commerce Commission, in compliance with the interstate commerce law, was $3.61, then the jury must find for the defendant."

## *Defendant's Instructions No. 5.*

"The court instructs the jury that if they believe from the evidence the Louisville and Nashville Railroad Company, in connection with the Southern Railway Company, had posted at Mount Pleasant and filed with the Interstate Commerce Commission, in compliance with law, a schedule of charges at the time the plaintiffs say they made the contract with the defendant, which schedule named a rate from Mount Pleasant to Raleigh different from $3.01 per short ton; and if the jury further believe from the evidence that the Louisville and Nashville Railroad Company, in connection with the Southern Railway Company, had posted at Mount Pleasant and filed with the Interstate Commerce Commission, in compliance with law, from October 25, 1897, during the remainder of the time in which the rock mentioned in the declaration was being offered for shipment, schedule of charges which named the rate of $3.61 per short ton from Mount Pleasant to Raleigh, then the charge of $3.61 was lawful and proper, and the jury should find their verdict for the defendant."

On objection by each party to the instructions offered by the other, the court granted the instructions offered by the plaintiffs, and refused those tendered by the defendant, and thereupon the defendant excepted to the action of the court in both particulars.

*W. L. Williams*, for the plaintiff in error.

*Walke & Old*, for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Wilcox and DeJarnette, the defendants in error, brought an action of *assumpsit* to recover from the Southern Railway Company, the plaintiff in error, the difference between an alleged

agreed rate of freight and that actually charged and collected by the railway company for the transportation of certain phosphate rock from Mount Pleasant, in the State of Tennessee, to Raleigh, in the State of North Carolina. The case has been twice tried. The judgment entered upon the first trial was reversed by this court upon a former writ of error, upon the ground that the declaration did not aver any consideration for the alleged promise of the railway company upon which the action was based, and the cause remanded, with leave to the plaintiffs to amend their declaration. *Southern Ry. Co.* v. *Wilcox & DeJarnette*, 98 Va. 222.

A demurrer to the declaration as amended, and to each count thereof, was overruled. This action of the court is assigned as error.

The objection made to the first, second, and fourth counts is, that neither avers that the phosphate rock was furnished by the plaintiffs for transportation within a reasonable time after the alleged contract for shipment was made.

The first and fourth counts aver in substance that the railway company offered to carry the rock upon certain terms, and that the plaintiffs accepted the offer. The second count avers that the railway company agreed to carry the rock at a named price, and that, in consideration thereof, the plaintiffs bound themselves to deliver it for transportation. Each of the three counts aver that the plaintiffs did furnish the rock as they had agreed to do, but the railway company charged and collected a greater freight per ton for carrying it than the contract price. No time was fixed by the alleged contract in which the rock was to be delivered for shipment. The plaintiffs had, therefore, a reasonable time within which to deliver it, and the averments in each of the counts that it was delivered for shipment as they had agreed to furnish it, must be construed as averring that it was furnished within a reasonable time after making the contract. The trial court so construed the counts, as is clear from the in-

structions given for the plaintiffs, and properly held them sufficient.

The objection made to the third count is, that whilst it avers an offer on the part of the railway company to transport the rock upon the terms named, and an acceptance of the offer on the part of the plaintiffs, it fails to aver that it was accepted before it was withdrawn. The averment that the offer was accepted necessarily implies that it had not been withdrawn, for there could be no acceptance of an offer that had been withdrawn.

The demurrer to the declaration, and to each count thereof, was properly overruled.

The rejection of two special pleas offered by the railway company, in which it was averred that the agreement sued on was in violation of the act of Congress commonly known as the Interstate Commerce Act, and was therefore illegal and void, is assigned as error.

The defence that the contract was illegal was clearly admissible under the general issue which had been pleaded. 4 Minor's Inst. 773; 5 Rob. Pr., 255, &c.; *Va. F. & M. Ins. Co.* v. *Buck & Newson,* 88 Va. 517.

But if it had not been, the railway company was not injured by the rejection of the special pleas, as it was permitted to introduce its evidence upon that question under the general issue.

The admission in evidence of certain letters written by the plaintiffs to the defendant's general agent at Norfolk, Va., dated, respectively, January 29, February 23, and April 25, 1898, is assigned as error.

The letter of January 29th states that, from the tenor of the letters the plaintiffs were receiving from Raleigh, they were very much afraid that, unless the freight matter from Mount Pleaant to Raleigh was adjusted satisfactorily very soon, much trouble would result; that they did not like the tone of the last two communications they had received from the people to whom they had sold the phosphate rock on that subject, and urged the rail-

way company to settle the question without further delay. It further states that they enclosed a letter which showed that the rate of freight from Mount Pleasant to Norfolk was still $3.30 per gross ton, that being the figure named therein about the time freight to Raleigh was given them. The letter of February 23d noted the reception or the agent's letters of the 2d and 5th of that month, expressed surprise at the conclusion of the general freight agent of the railway company as stated in those letters, and the hope that upon the reconsideration of the matter he would take a different view of the question. The letter then gives a history of the matter in controversy, from the plaintiffs' standpoint, from the time of their application for special rates in the winter of 1897, down to the date of the letter, and insisted that the railway company ought to transport the whole 3,000 tons of phosphate rock at the alleged contract price. The letter of April 23d states that there is enclosed certain letters as requested by the defendant's agent, mentioning briefly the contents of each, all of which refer to the freight rate to Norfolk. The letter discusses the justice and propriety of giving a lower rate to Norfolk than to Raleigh, when shipments made over the railway company's road must pass the last named point to reach Norfolk.

These letters were all written long after the contract in question is alleged to have been made and broken. They are no part of the *res gestæ*. They are, for the most part, mere statements of the plaintiffs' view of the differences between the parties, and the expression of plaintiffs' desire to have them adjusted. The fact that a lower rate may have been charged by the railway company upon shipments of phosphate rock to Norfolk than was charged to Raleigh could not have any bearing upon the issues in this case, as the plaintiffs' demand was based, not upon an unreasonable or excessive charge, but upon a violation of their contract rights.

These letters ought not to have been admitted in evidence.

Neither were the contracts referred to in bills of exceptions, numbered twelve, thirteen, and seventeen, proper testimony. They were contracts to which the railway company was not a party, and of which it had no knowledge until after they were made. It may be that the plaintiffs, in making their contracts for the sale of phosphate rock, fixed their prices with reference to the rate of freight quoted to them by the railway company, but that fact does not tend to show that they had accepted the railway company's offer, and bound themselves to furnish the rock for shipment. If they accepted the railway company's offer, and bound themselves to furnish the rock for shipment, it is wholly immaterial to whom they sold the rock, or whether they sold it at all. Their making contracts for the sale of the rock to which the railway company was not a party, and of which it had no knowledge until after the contracts were made, would no more tend to show that they had accepted the offer than their not making contracts for its sale would tend to show that they had not accepted it.

Instructions numbered one and two are objected to upon the ground that there was no sufficient evidence upon which to base them.

These instructions in effect told the jury that if they believed that the railway company had offered to transport the phosphate rock at the price named, and that the plaintiffs had accepted the offer before a withdrawal of the same, then such acceptance constituted a contract; and if they further believed from the evidence that the plaintiffs furnished the rock for shipment within a reasonable time, under all the facts and circumstances of the case, then the defendant was bound to transport the rock at the agreed rate. There was evidence tending to prove the facts upon which these instructions were based. Whether it was sufficient or not to support a verdict could not, under our practice, be passed upon by the court when instructing the jury. Where a defendant is of opinion that the plaintiff has failed to prove his

case, he can demur to the evidence, and generally have the court pass upon its sufficiency, or he can wait until the jury have found their verdict, and, if it be against him, have the court pass upon its sufficiency upon a motion to set aside the verdict. But if the case goes to the jury, and there is any evidence tending to prove a fact, it is proper for the court to give an instruction applicable to it, if requested to do so, even though it is so slight as to be insufficient to support a verdict founded upon it. *Jones* v. *Morris*, 97 Va. 43, 49, and cases cited.

The objection to the other instruction, numbered three, given for the plaintiffs, is that the question of whether the phosphate rock had been delivered for shipment within a reasonable time after the making of the alleged contract, was a question for the court, and ought not to have been submitted to the jury, as was done by the instruction. There was considerable delay on the part of the plaintiffs in delivering the rock for transportation, but for this delay, if there was a valid contract for its shipment, the defendant was to some extent responsible. It made overcharges on the earlier shipments, in adjusting which there was delay. Soon afterwards, the connecting carrier objecting to a continuance of the contract rate of freight, the rate was changed. All these things had more or less effect upon the delivery of the rock for shipment, and the question whether it was delivered within a reasonable time was properly left to the jury, to be determined by them under the facts and circumstances in evidence.

From what has been said in reference to the last named instruction, it follows that the court rightly refused to give the railway company's instruction numbered one, which was in conflict with it.

The railway company's instructions numbered two and three, which the court refused to give, told the jury, in effect, that, unless they believed from the evidence that the plaintiffs had promised or agreed to furnish about three thousand tons of phosphate rock to be carried by the railway company at the freight

rate named in its offer, the plaintiffs were not entitled to recover, and they must find for the defendant.

There was no consideration for the promise of the railway company to transport the rock, unless there was a promise on the part of the plaintiffs which bound them to furnish the rock for shipment. The fact that the plaintiffs made a contract with a third party for the sale and delivery of the rock, based upon the rate of freight named by the defendant, cannot affect the question. If the plaintiffs accepted and bound themselves to furnish the rock for shipment, they were entitled to have it shipped at that rate, if the contract was in other respects valid. If they did not accept the offer, and were not bound to furnish it for shipment, they had no right to have it shipped at the rate named, if the regular rate was different, although they may have made contracts with third parties upon the basis of the named rate. The mutual obligations of the parties, the one to transport and the other to furnish for transportation, would have been a sufficient consideration for the promise of each, but if the plaintiffs did not accept the offer of the railway company, and were not bound to furnish the rock for shipment, the railway company's offer or promise was a mere nude pact, the breach of which would furnish no ground of action (*Southern Ry. Co.* v. *Wilcox & DeJarnette, supra; C. & G. E. R. R. Co.* v. *Dane,* 43 N. Y. 240), and the jury should have been so instructed.

The refusal of the court to give instructions numbered four and five, asked for by the railway company, is also assigned as error.

These instructions were intended to raise the question of the legality of the contract sued on. One of the objections made to them is that there was no proper evidence before the jury upon which to base them. In this contention the plaintiffs are clearly in error. Witnesses testified as to the established freight rate in force at the time the contract was alleged to have been made, and copies of the freight schedules on file in the office of the

Interstate Commerce Commission were introduced, all of which tended to prove that the established rate was higher than the alleged contract rate.   It is true that these copies were not attested in the manner provided by section 3343 of the Code, but a witness was introduced who testified that he had compared them with, and that they were exact copies of, the originals on file in the office of the Interstate Commerce Commission. The railway company had the right to prove the freight rate on file in the office of the Interstate Commerce Commission by introducing in evidence examined copies.   That is one of the usual methods of proving records.   The method provided by section 3343 of the Code is merely cumulative.   The enactment of such statute rendering admissible a convenient species of evidence does not thereby deprive parties of the right to resort to any other mode of proof allowable at common law, unless in the enactment of the statute it is clearly indicated (as it is not in this case), that it was the intention of the legislature to abrogate the old rule.   2 Taylor on Evidence, secs. 1546-7; 1 Greenleaf on Evidence, secs. 505-508.

The plaintiffs' shipments were interstate freight, and must be governed by the Interstate Commerce Act. That statute prohibits an interstate carrier from contracting for or collecting a less rate of freight on interstate shipments than that specified in the schedules of rates in force at the time, and which are required to be printed and kept at all stations for the inspection and use of the public.   The evidence, as before stated, tended to show that the alleged contract was in violation of that act.   If it was, there could be no recovery upon it. The general rule of law being that a contract made in violation of law is void, and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover.   *Camp* v. *Bruce*, 96 Va. 521; *Hancock* v. *R. R. Co.*, 145 U. S. 416; 5 Rob. Pr. 409, etc.   There is no reason why contracts in violation of the Interstate Commerce Act should not be governed by the general

rule, and the courts which have passed upon this question have generally so held. See *F. & W. Ry. Co.* v. *Bundick* (Ga.), 21 S. E. R. 995; *S. R. R. Co.* v. *Harrison* (Ala.), 24 S. R. 552; *C. R. I. & P. R. R. Co.* v. *Hubbell*, 38 Pac. Rep. 266; *S. A. & A. R. R. Co.* v. *Clements*, 49 S. W. 913; *Wight* v. *U. S.*, 167 U. S. 513.

It is insisted that, although the contract in question may have been at the time it was made in violation of the Interstate Commerce Act, yet that the railway company and connecting carriers subsequently lowered their rate in the manner provided by the Interstate Commerce Act, so as to conform to the contract rate, and carried a portion of the phosphate rock at the lowered rate, thus making valid the contract rate, but afterwards restored the rate to what it was when the contract was made, and charged and collected the restored rate on all subsequent shipments, in violation of the plaintiffs' rights. The evidence tends to show that the railway company, after it learned that the plaintiffs had made a contract for the sale of the phosphate rock upon the faith of the rate quoted to them by mistake, did induce the connecting carriers to lower the rate so as to conform to the contract rate, and kept that rate in force from July 22, 1897, until the 16th of the following November, when the rate was advanced or restored to what it was when the alleged contract was made. The fact that the railway company and connecting carriers lowered their rate after the alleged contract was made, and transported a part of the phosphate rock at the lowered rate, did not make the contract sued on valid and binding on the railway company if it was invalid in its inception. The railway company was under no *legal obligation* to lower the rate, and if it and the connecting carriers lowered it when they were under no legal obligation to do so, they clearly had the right to advance it to the old rate (if that rate was reasonable, and that is not questioned in this case), in accordance with the provisions of the Interstate Com-

merce Act.   There being no legal duty upon them to lower the rate, they violated no right of the plaintiffs in restoring it.

The plaintiffs' right to recover depends upon the validity of their alleged contract. If that was made in violation of the Interstate Commerce Act, they cannot recover, and the jury ought to have been so instructed.

It will be unnecessary, if not improper, to consider the remaining assignment of error, viz., that the verdict was contrary to the evidence, as the judgment of the court will have to be reversed for the errors above mentioned, and the cause remanded for a new trial, in which the evidence may be different.

The judgment of the Court of Law and Chancery must be reversed, the verdict set aside, and the cause remanded for a new trial to be had not in conflict with the views expressed in this opinion.

*Reversed.*