# Wytheville

## F. J. McGuire v. Atlantic Coast Line Railroad Company.

June 14, 1923.

1. CARRIERS—*Bill of Lading—Tariffs as Part of Contract.*—A clause in a bill of lading provided that the contract of carriage was "subject to the classifications and tariffs in effect on date of issue of the bill of lading." The clause makes the tariff a part of a contract of carriage.

2. CARRIERS—*Payment of Freight—Switching Connection—Destination— Case at Bar.*—A bill of lading gave the destination of a carload shipment as a private siding at Norfolk, Virginia, and provided that the contract of carriage was "subject to the classifications and tariffs in effect on date of issue." Defendant carrier's tariff provided that carload freight for delivery to a switching connection at destination, performing switching service only, would not be delivered until all charges had been paid. It was necessary, in order that the carload shipment might reach its destination, that the carrier should deliver it to a belt line company performing switching service only.

    *Held:* Before making such delivery defendant carrier had a right to demand payment of all charges.

3. CARRIERS—*Destination—Private Siding—Delivery to Switching Connection—Case at Bar.*—Defendant railroad's tariff provided that carload freight for delivery at a switching connection at destination, when such connection performed switching service only, would not be delivered until all charges assessed had been paid. In the instant case the bill of lading gave the destination of a carload shipment as a private siding on the Norfolk and Western Railroad at Norfolk, Virginia.

    *Held:* That while the private siding was the ultimate destination, yet when the car reached a station on defendant carrier's line where it must be delivered to a switching connection, it had reached the point of destination at which defendant carrier had the right and was required not to deliver the car to the switching connection until all charges had been paid.

4. CARRIERS—*Switching Connection—Payment of Charges—Interstate Commerce.*—Where a carrier's tariff provided that carload freight for delivery to switching connections, performing switching services

only, should not be delivered until all charges had been paid, delivery to a switching connection without payment in advance would have been a violation of the terms of the contract and a discrimination in favor of the consignee, in contravention of the interstate commerce act.

5. CARRIERS—*Payment of Freight—Switching Connection—"Destination"—Case at Bar.*—The transportation act of 1920, section 173, U. S. Stat. at Large, Vol. 41, part 1, page 479, section 405 (2), provides that no carrier by railroad shall relinquish possession at destination until all tariff rates and charges have been paid.

   *Held:* That the word "destination," as used in this act and applied to the instant case, manifestly meant the station at which the carrier, under the tariff rules, was authorized and required to collect the charges before delivery of the car to a "switching connection."

6. CARRIERS—*Contract in Violation of Tariff.*—Contracts made in violation of the carrier's tariffs are void.

7. CARRIERS—*Connecting Carriers—Payment of Charges—Interstate Tariff Rules—Case at Bar.*—Under the tariff rules of the Interstate Commerce Commission, the Norfolk and Western Railway Company could not lawfully accept a carload shipment unless all charges, including its own charges for switching service, were prepaid by the initial carrier, and the consignee having refused to pay the lawful charges, he thereby prevented the initial carrier from fulfilling the contract of carriage, and could not be heard to complain of its failure to forward the car.

8. CARRIERS—*Authentication of Carrier's Tariffs—Section 6206 of the Code of 1919.*—Section 6206 of the Code of 1919, providing for the authentication of records and exemplifications of office books kept in any public office of the United States, or a State, is not exclusive and there may be an authentication under the common law rule; therefore, railroad tariffs filed with the Interstate Commerce Commission need not be authenticated as required by this section.

9. CONFLICT OF LAWS—*Conflict between Federal and State Law—Construction of Statute.*—Where there is an apparent conflict between the provisions of the Federal and State law, the court should, if possible, adopt that construction which will tend to facilitate the administration of justice.

10. CARRIERS—*Authentication of Carrier's Tariffs—Section 6206 of the Code of 1919.*—It is apparent from the language of section 6206 of the Code of 1919 that it would be impossible to procure copies of railroad tariffs authenticated as required by that section, for the judge or other officers mentioned in the statute could refuse to comply with the State law on the ground that they, being Federal officers, had no authority to make the certificate required by the Virginia law, and in view of the multitude of cases, to hold that the carrier's lawful tariffs must be proved in a State court by a compared copy would,

in effect, prevent the enforcement of the provisions of the interstate commerce laws.

11. EVIDENCE—*Right of State to Prescribe the Rules of Evidence—Federal Questions.*—While generally speaking a State has the right to prescribe the rules of evidence for its courts, this rule has no application where, as in the instant case, a Federal question is involved, as to which Federal acts and decisions are controlling.

12. CARRIERS—*Authentication of Carrier's Tariffs—Compliance with Act Creating Interstate Commerce Commission—Case at Bar.*—In the instant case it was contended that the tariffs admitted in evidence were not properly authenticated as required by section 6206 of the Code of 1919.

    *Held:* That as the tariffs were authenticated in accordance with the provisions of the Federal act creating the Interstate Commerce Commission, U. S. Comp. Stat. 1916, section 8584 (12), they were admissible.

13. UNITED STATES COURTS—*Courts Following State Law.*—Section 721 of the Revised Statutes of the United States, providing that the laws of the several States shall be regarded as rules of decision in trials in the courts of the United States where they apply, relates to the nature and principles of evidence, and also to the competency of witnesses.

14. CONFLICT OF LAWS—*State and Federal Law—Supremacy of the Federal Law.*—The legislatures of the several States have no power to legislate upon a subject over which the State has no jurisdiction or power of control. State law upon the subject, whether in the form of judicial decisions or legislative enactments, must give way to Federal acts and decisions.

15. INTERSTATE COMMERCE—*Congress has Occupied the Whole Field.*—Congress, by the act to regulate commerce, has occupied the whole field of regulation with respect to interstate commerce, thereby taking entire charge of the interstate transportation of freight, and the rights, duties and liabilities of both shippers and carriers.

16. INTERSTATE COMMERCE—*Evidence—Power of Congress to Establish Rules of Evidence.*—If by the assumption of jurisdiction Congress deprives the State of the power to enforce a State law, *a fortiori* can it say what may be admitted as evidence in State courts where a question of interstate commerce is involved.

17. CARRIERS—*Evidence—Authentication of Tariffs—Federal and State Acts.*— The Federal act (U. S. Comp. Stat. 1916, section 8584 [12]), providing for the authentication of interstate tariffs to be admitted as evidence, may be relied upon as an additional method of authentication, and extracts from any schedules, classifications, tariffs, contracts, or reports, duly authenticated under that act, are admissible in evidence, in a State court, with like effect as the originals, or copies authenticated in accordance with section 6206 of the Code of 1919.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, in an action of trover. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*J. T. Lawless,* for the plaintiff in error.

*H. Laurence Brooks* and *Wm. B. McIlwaine,* for the defendant in error.

West, J., delivered the opinion of the court.

This writ of error is to a judgment upon a verdict for the defendant in a suit by F. J. McGuire against the Atlantic Coast Line Railroad Company, for the wrongful conversion of a carload of freight.

The plaintiff was engaged in the business of grading and improving public roads and streets. The defendant is a common carrier engaged in intrastate and interstate commerce.

[1-4] On August 16, 1921, the plaintiff loaded a flat car at Tarboro, North Carolina, with his "contractor's outfit," including one automobile truck, for Silk Mill siding, on the Norfolk and Western Railway at Norfolk, Virginia. The company issued to him a standard through bill of lading therefor, showing the car to be consigned to F. J. McGuire, destination, Norfolk, Virginia, for placing at route, Thirty-ninth street, Norfolk and Western Railway (Silk Mill siding), and agreed to carry the car, "subject to the classifications and tariffs in effect on date of issue of the bill of lading." The tariff of the Atlantic Coast Line Railroad Company on file with the Interstate Commerce Commission on the date of the issue of the bill of lading, provided as follows:

### "Demanding Payment of Charges Before Delivery to Switching Line.

"Applicable at all stations on the Atlantic Coast Line Railroad.

"Carload freight for delivery to a switching connection at destination, when such connection performs switching service only, will not be delivered to such connecting line until all charges assessed in accordance with tariffs lawfully on file have been paid. (See note below.) If cars are held for payment of charges pending such delivery, they will be subject to car service and demurrage rules while so held.

"Note.—If consignees are on the authorized credit list, it will be assumed for the purpose of this rule that they have paid all freight charges referred to."

The tariff rules of the commission governing the handling of traffic to and from the connecting lines in switching movements, on file and in effect on the date of the issue of the bill of lading, were as follows:

"(1) Carload freight from connecting lines for delivery on Norfolk and Western Railway tracks within switching district, whether on public team track, private or other siding, when the Norfolk and Western Railway performs a switching service only, will not be received from connecting lines:

"(a) Unless all charges (including Norfolk and Western Railway charges) are prepaid by connecting lines.

"(b) And when billed 'shipper's order' until the line receiving road haul has taken up the 'order' bill of lading."

The Norfolk and Portsmouth Belt Line Railroad Company is a switch connection between all the railroads entering Norfolk, with two exceptions, and performs switching service only. It owns no cars, only

engines, maintains no office force, and has no means of collecting from the consignee tariff rates or charges. The Norfolk and Western would perform a switching service only in placing the car at Silk Mill siding.

The only way the defendant company could place the car at Thirty-ninth street, Norfolk and Western Railway (Silk Mill siding), was to deliver it to the Norfolk and Portsmouth Belt Line Railroad Company at Pinner's Point for delivery by it to the Norfolk and Western Railroad Company, to be placed for unloading at Silk Mill siding.

Pinner's Point is the rail terminus of the defendant company, across the Elizabeth river from Norfolk, and the company has a depot but no track on the Norfolk side thereof.   On account of delay in loading, $18.00 demurrage accrued against the car at Tarboro.   The car arrived at Pinner's Point on August 19, 1921.   The consignee was notified of its arrival, and the aggregate amount of charges against the car was $145.80, as follows:   Demurrage   at   Tarboro,   $18.00;   freight, $118.85;   Norfolk   and   Western   switch   charge,   $4.00; Norfolk and Portsmouth Belt Line switch charge, nothing, this charge having been, under the rules of the commission, absorbed by the defendant company, and war tax on the aggregate, $4.23.

Demand was made for the payment of these charges, and the plaintiff was informed that the car would not go forward until the same were paid.   The plaintiff refused to pay the same and the defendant refused to part with possession of the car until the charges were paid.   No demurrage accrued at Pinner's Point until after the free time had expired and after the controversy arose as to the proper classification of the shipment.   F. J. McGuire, the consignee of the car, was not on the authorized credit list.

The car was held for payment of charges pending delivery and subject to car service and demurrage rules, as required by the tariff, *supra.*

The plaintiff filed this suit to recover damages for the conversion and use of his property, which resulted in the judgment complained of.

The plaintiff admits the accuracy of the *amount* of the charges, if he is liable for same, but contends that the word "destination" as used in the tariff, means the destination named in the bill of lading, namely, Thirty-ninth street, Norfolk and Western Railway (Silk Mill siding), and that the company had no right to demand payment of the charges while the car was at Pinner's Point. The contention of the defendant is that "destination" means *some station* on the Atlantic Coast Line Railroad, where all that remains to be done by the carrier to effect delivery of the car is to deliver it to a "switching connection," which performs "switching service only."

The clause in the bill of lading, "subject to the classification and tariffs in effect on the date of issue of the bill of lading," makes the tariff a part of the contract of carriage. When so read, while the Silk Mill siding is the *ultimate* destination, it is obvious that by the terms of the bill of lading, when the car reached Pinner's Point, a station on the Atlantic Coast Line, where it must be delivered to a switching connection in order to secure its placement at Silk Mill siding, it had reached the point of destination at which the defendant had the right and was required by the tariff not to deliver the car to such connection until all charges, including demurrage, assessed in accordance with the tariff lawfully on file, had been paid. The charges made were in accordance with the tariff then in force, and the company clearly had the right to refuse to

deliver the car to the switching connection, the Belt Line Railroad, until the same were paid. Such delivery, without payment in advance, would have been a violation of the terms of the contract and a discrimination in favor of the consignee, in contravention of section 8569 (7) of the interstate commerce act, which prohibits a carrier from extending to any shipper any privilege or facilities in the transportation of property, except such as are specified in the tariff.

[5] The transportation act of 1920, section 173, U. S. Stat. at Large, Vol. 41, part 1, page 479, section 405 (2), provides that "* * No carrier by railroad, subject to the provisions of this act, shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the commission may from time to time prescribe, to insure prompt payment of all proper rates and charges, and to prevent discrimination * *." The word "destination" as used in this act, when applied to the instant case, manifestly means the station at which the carrier, under the tariff rules, was authorized and required to collect the charges before delivery of the car to the "switching connection."

[6, 7] Contracts made in violation of the carrier's tariffs are void. If the defendant had agreed to place the car without demanding the payment of its charges in advance, the contract could not have been enforced. *Chicago, etc., R. Co.* v. *Kirby,* 225 U. S. 155, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914 A, 501; *Southern Ry. Co.* v. *Wilcox,* 99 Va. 394, 39 S. E. 144; *Norfolk Southern R. Co.* v. *Whitehurst,* 117 Va. 542, 85 S. E. 458. Besides, under the tariff rules of the commission, *supra,* the Norfolk and Western Railway Company could not lawfully accept the car, unless all charges

(including its own charges for switching service) were prepaid by the Atlantic Coast Line which received the road haul. The consignee having refused to pay the lawful charges, he thereby prevented the defendant from further fulfilling the contract of carriage, and cannot be heard to complain of its failure to forward the car.

It is contended that the instant case is controlled by the decision of this court in *North Shore Imp. Co.* v. *N. Y. P. & N. R. Co.*, 130 Va. 464, 108 S. E. 11. We cannot concur. In the *North Shore Case*, the carrier endeavored, upon evidence of a *custom* unknown to the shipper, to charge and collect demurrage at Port Norfolk, Virginia, on a car to be delivered, as stated in the bill of lading contract, at Colley avenue siding, in the city of Norfolk, Virginia. The court held that, in the absence of a "special stipulation" to the contrary, the carrier is not entitled to collect "freight or demurrage, charges although previously earned," until the car is delivered at the place specified in the bill of lading. The bill of lading in the instant case, by virtue of the tariff and classifications which are a part thereof, contained a "special stipulation" to the effect that if the car be delivered to a "switching connection" which performs "switching service only," it should not be delivered to such connecting line until all lawful charges assessed against it had been paid; and that if the car was held for payment of charges, pending such delivery, it would be subject to car service and demurrage rules while so held.

In the case of *Citizens Bank* v. *N. & W. Ry. Co.*, 115 Va. 45, 78 S. E. 568, this court permitted the carrier to charge and collect freight and demurrage on cars which were held by the carrier on its tracks six miles from "its piers at Lambert's Point," the place desig-

nated in the bill of lading as the destination of the cars, because it was a foreign shipment controlled by the rules of the Interstate Commerce Commission, which made the terminal yards of the company the destination, and provided for the demurrage charge.

[8] We find no merit in the contention of the plaintiff that the tariffs admitted in evidence are not properly authenticated.    It is true that they were not authenticated as required by the Virginia statute, Code 1919, section 6206; nor was this necessary.    The Virginia statute, section 6206, is not exclusive and plaintiff's counsel recognizes that there may be an authentication under the common law rule.

[9, 10] Where there is an apparent conflict between the provisions of the Federal and State law, the court should, if possible, adopt that construction which will tend to facilitate the administration of justice.    It is apparent from the language of section 6206, *supra*, that it would be impossible to procure copies of tariffs authenticated as required by this section, for the judge or other officers mentioned in the statute could refuse to comply with the State law on the ground that they, being Federal officers, had no authority to make the certificate required by the Virginia law.    If the Federal law does not apply, the only other way to use the tariffs in a State court would be to produce at the trial a compared copy.    To obtain such a copy, the carrier would have to send an agent with a copy of the tariff to Washington, D. C., and compare it with the original. In view of the multitude of cases constantly pending in the courts of the forty-eight States, to hold that the carrier's lawful tariffs must be proved in a State court by a compared copy would, in effect, prevent the enforcement of the provisions of the interstate commerce act.

[11] While generally speaking a State has the right to prescribe the rules of evidence for its courts, this rule has no application where, as in the instant case, a Federal question is involved, as to which Federal acts and decisions are controlling. *Metz* v. *B. & M. R. Co.*, 227 Mass. 307, 116 N. E. 475; *Southern Exp. Co.* v. *Byers*, 240 U. S. 612, 36 Sup. Ct. 410, 60 L. Ed. 825, L. R. A. 1917 A, 197.

[12] It is not controverted that the tariffs are authenticated in accordance with the following provision of the Federal act creating the Interstate Commerce Commission: "* * * and copies of and extracts from any of said schedules, classifications, tariffs, contracts, agreements, arrangements, or reports, made public records as aforesaid, certified by the secretary, under the commission's seal, shall be received in evidence with like effect as the originals." U. S. Comp. Stat. 1916, section 8584 (12).

[13] Section 721 of the Revised Statutes of the United States (U. S. Comp. St. §1538) provides that "the laws of the several States, *except* where the Constitution, treaties, or *statutes* of the United States *otherwise* require or *provide*, shall be regarded as rules of decision, in trials at common law, in the courts of the United States in cases where they apply." This section relates to the nature and principles of evidence, and also to the competency of witnesses. *Life Ins. Co.* v. *Union Trust Co.*, 112 U. S. 250, Sup. Ct. 119, 28 L. Ed. 708.

[14-16] The legislatures of the several States have no power to legislate upon a subject over which the State has no jurisdiction or power of control. State law upon the subject, whether in the form of judicial decisions or legislative enactments, must give way to Federal acts and decisions. Congress, by the act to regulate commerce (U. S. Comp. St. §8563, *et seq.*), has occupied the

whole field of regulation with respect to interstate commerce, thereby taking entire charge of the interstate transportation of freight, and the rights, duties and liabilities of both shippers and carriers. In an opinion handed down to-day in *Williamson* v. *Seaboard Air Line Railway, post* p. 626, 118 S. E. 255, we held that Congress, in occupying the "entire field" with respect to interstate free passes, under the Hepburn act (34 Stat. 584), has superseded a State law which would otherwise have determined the rights of the holder of the pass, and entitled her, in a proper case, to recover. If by the assumption of jurisdiction Congress deprives the State of the power to enforce a State law, *a fortiori* can it say what may be admitted as evidence in State courts where a question of interstate commerce is involved.

[17] It follows that the Federal act, *supra*, providing for the authentication of interstate tariffs to be admitted in evidence, may be relied on as an additional method of authentication, and that copies of and extracts from any schedules, classifications, tariffs, contracts, agreements, or reports, duly authenticated under said act, are admissible in evidence, in a State court, with like effect as the originals, or copies authenticated in accordance with section 6206, Virginia Code, 1919.

The remaining assignments of error need not be considered, as those already discussed are decisive of the case.

Under the evidence, the jury could have properly rendered no other verdict. The judgment will be affirmed.

*Affirmed.*