## Wytheville

## CITIZENS BANK OF NORFOLK v. NORFOLK AND WESTERN RAILWAY COMPANY.

### June 12, 1913.

1. CONTRACTS—*Guaranty.*—A promise by an assignee "to pay the just freights and demurrage charges on coal covered by this assignment" is a direct promise to pay such freights and demurrage charges and is not merely a guarantee of such payments.

2. CONTRACTS—*Construction—Question for Court.*—Whether, under a written contract which is the ground of action, the defendant is primarily liable for the sum claimed, or merely guaranteed its payment, is a question for the court and not for the jury.

3. WAIVER—*Case at Bar.*—It clearly appears from the evidence in the case at bar, that nothing done or said by the plaintiff was intended to waive, or could have misled any reasonably prudent person into believing that it had waived, its right to demand and recover from the defendant all the unpaid freight and demurrage charges which it undertook and agreed to pay.

4. PRINCIPAL AND AGENT—*Notice to Agent—Estoppel.*—A principal who has directed a carrier to deliver shipments of coal to his agent, and has notice through such agent of the manner in which notice of coal shipments are given, and acquiesces therein during the period of the agency, cannot thereafter object to the sufficiency of the notice because not given in a different manner.

5. RAILROADS—*Demurrage—Interstate Shipments—Rules of Interstate Commerce Commission.*—The evidence in the case at bar shows that the demurrage sued for was on interstate shipments of coal and was based upon rules prescribed by the Interstate Commerce Commission. The cars were upon the terminal yards of the railway company at Norfolk, and the fact that those yards were six miles long and the cars were located at various points on them and not actually on the pier at Lambert's Point furnishes no reason why demurrage should not be paid on those cars for their detention while awaiting the convenience of the consignee, or the arrival of the vessel into which they were to be unloaded.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk in a proceeding by motion for a judgment under section 3211 of the Code.  Judgment for the plaintiff.  Defendant assigns error.

*Affirmed*

The opinion states the case.

*J. G. Martin,* for the plaintiff in error.

*Hughes, Little & Sewell,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The Norfolk and Western Railway Company proceeded by notice and motion, under section 3211 of the Code, against the Citizens Bank of Norfolk, to recover freight charges and demurrage on coal.  There was a verdict and judgment in favor of the railway company.  To that judgment this writ of error was awarded.

The court gave two instructions to the jury, upon motion of the railway company, and declined to give three instructions asked for by the bank.  This action in giving and refusing instructions is assigned as error.

By instruction No. 1 given for the railway company, the jury were told that the bank in agreeing to pay all just freight and demurrage charges on coal covered by the McRae assignment, became primarily responsible for all such charges, and was liable to the railway company for so much thereof as might be shown to remain unpaid.

It appears that for some time prior to the year 1910 C. J. McRae had been doing business in Norfolk as a coal dealer, handling coal in carload lots consigned to him in various consigning names from mines in the State of West Virginia, and carried by the railway company for transshipment from its piers at Lambert's Point.  On the 5th

of May, 1910, McRae executed an assignment to the bank, as agent of the Consolidated Coal Company, and on the 15th day of June following he executed two assignments to the bank, individually, of all coal that was then or that might be consigned thereafter to him under his consigning names. These assignments, so far as they involve questions for decision in this case, are substantially the same, and by them McRae, for value received, assigned to the bank all cars of coal that were then on the tracks of the railway company either en route to or at Lambert's Point. On the 12th of July following, the railway company acknowledged the receipt of the McRae assignments, and wrote: "We will accept this assignment and deliver such coal on the order of the Citizens National Bank of Norfolk with the understanding and guarantee of the bank that all freight and demurrage charges accruing on such coal will be paid by the bank as presented. Please have the necessary agreement drawn up and executed by the bank."

On the 15th of the same month, the bank wrote to the railway company as follows: " Referring to conversation of yesterday regarding letter from Mr. Spangler accepting the assignment from C. J. McRae to this bank, we write to confirm our agreement to pay the just freights and demurrage charges on coal covered by this assignment and authorize delivery to Mr. C. J. McRae as agent for the bank until notice is given to the contrary."

Pursuant to this agreement, the bank paid freight and demurrage charges on coal shipments covered by the said assignments until October 10, 1910, when it wrote to the railway company terminating the said agreement, to take effect as of the 12th of that month.

There can be no question that by the terms of the letter of the railway company of July 12, and the bank's letter of July 16, the bank expressly undertook and agreed to

pay all such freight and demurrage charges on the coal covered by McRae's assignments to it, and did not, as the bank insists, merely guarantee such payments. While there had been conversations and communications between the agents of the railway company and the agents of the bank in reference to the matter prior to the letters of July 12 and 16, 1910, those letters evidence the undertaking and agreement of the parties. Whether the bank was primarily liable for such charges or had merely guaranteed their payment as claimed in instruction "A" offered by it, was a question for the court and not for the jury. The court did not, therefore, err in giving instruction No 1 offered by the railway company, or in refusing to give instruction "A" asked for by the bank.

Neither do we think the court erred in giving instruction No. 2 offered by the railway company, nor in declining to give instruction "C" asked for by the bank, which was in conflict with the former.

By the instruction given the jury were told that the delay of the railway company in presenting its final accounts did not constitute a waiver by it of its demand against the bank. That demand consisted of freight and demurrage charges on coal shipped on or before October 12, 1910, at which time the bank by letter terminated, as it had the right to do, its agreement to pay freight and demurrage charges on shipments made thereafter to McRae. That letter is as follows:

"This will notify you that the relations existing between Mr. C. J. McRae and ourselves under an assignment from him to us, a copy of which has been filed with you, by which he assigned all his interest in all coal shipped to him, will be terminated on and after Wednesday, October 12, 1910, and from that date you will please look to Mr. McRae for the payment of all charges due on coal consigned to him. For coal shipped to Mr. McRae covered by said as-

signment prior to that date we will be responsible for the freight and demurrage charges as heretofore, and will no-. tify your local agent what disposition to make of this coal.

"In order to avoid confusion, we would thank you to send us a statement of the car numbers and their weight, if any, which may be consigned to Mr. McRae before the 12th inst."

In that letter the bank recognizes that it is liable to pay all freight and demurrage charges on coal shipped to McRae prior to that date. In it the bank asked for a statement of the car numbers and weights of coal that were shipped to McRae before the 12th of October, 1910. This letter was received by the agent of the company to whom it was written, and referred to the comptroller of the railway company. On the same day the comptroller, without reference to that letter (and perhaps before it had been received by him) wrote the bank advising of a draft for June demurrage, and calling attention to the fact that the bank had not taken it up with the railway company as suggested in its letter of August 13th. On October 13th the bank returned the draft with the statement that the matter, "is now in dispute," and asked the comptroller to telegraph exactly how much freight the bank was responsible for. This was not done because, as the bank knew, the railway company did not have and could not obtain the information desired until the coal was actually delivered at Lambert's Point. On October 18th the railway company drew on the bank for certain freight charges on coal shipped prior to the 12th of that month, and two days later the bank wrote that it had paid the drafts, and concluded its letter with the statement, that "On the basis of our letters of October 10th and your reply of October 11th, we assume that you have no other charges against us for any coal shipped during the life of the assignment." Upon the receipt of that letter, and on the next day after it was written, the

4

comptroller of the railway company wrote: "I will look into the matter, and if there are any additional cars for which drafts should have been made will see that they are drawn for immediately, and will also endeavor to render you formal account as soon as cars covered by these drafts above mentioned are finally disposed of and deliveries made to vessels." On the 2nd of November following the railway company rendered what purported to be the final account and the total amount due to it from the bank for freight and demurrage. On the 7th of that month the bank wrote to the railway company in reply to its letter of the 2nd instant as follows:

"Your letter of the 2nd comes to us as a distinct surprise.

"In regard to the demurrage charge, if it proves to be just, this bank is liable for it, but Mr. McRae declines to admit its correctness, and we feel justified in withholding settlement for same until it is adjusted to his satisfaction, so please take up the matter with McRae and get his 'O. K.' to the claim.

"As to the additional charge of $2,066.56 we cannot admit any responsibility for the reason that it was understood that weekly drafts (which have been promptly paid), covered the freight on all coal as shipped.

"To prevent any misunderstanding, however, after our notice of October 10th that arrangement would terminate on the 12th, we wrote October the 13th requesting you to 'telegraph us exactly how much freight we are responsible for,' to which no reply was received, hence we assumed, as stated in our letter of October 20th, that drafts paid that day of $553.00 and $225.00 covered all outstanding freight charges for which we were liable under the assignment, and therefore released to Mr. McRae the coal then on the tracks amounting to over 5,000 tons, which was duly shipped by him, and we now have no security for any

additional freight, but we think, if you are able to satisfy Mr. McRae that freight now claimed is due, he will arrange to settle with you."

On the 11th of the month the railway company wrote the bank that in addition to the account rendered on the 2nd instant, there was another item of $633 for demurrage accruing during the month of October. This last item ought to have been included in what purported to be the final account rendered by the railway company November 2nd, but no prejudice, so far as the record shows, resulted to the bank by reason of its omission, for it appears from the bank's statement in its letter of November 7th, and from other evidence in the case, that it had on and prior to the 20th of October preceding released to McRae the coal then on the tracks amounting to over 5,000 tons.

It clearly appears from the correspondence quoted and referred to above, and from the other evidence in the cause, that nothing done or said by the railway company was intended to waive, or could have misled any reasonably prudent person into believing that it had waived, its right to demand and recover from the bank all the unpaid freight and demurrage charges which the bank undertook and agreed to pay under its agreement with the railway company.

By instruction "B" offered by the bank, the court was asked to instruct the jury that demurrage could not be recovered unless the jury believed from the evidence that the railway company notified the bank in writing, or as otherwise agreed by the railway company and the bank (if they believed that there was any other agreement) of the arrival of the cars, and that such notification contained the point of shipment, car initials and numbers and contents. This action of the court in refusing to give that instruction is assigned as error.

On March 12, 1909, Spangler, superintendent of trans-

portation of the railway company, wrote McRae calling his attention to the fact that some shippers or consignees desired daily notices of arrival of coal by car numbers, while others preferred a notice showing the numbers of cars on hand at Norfolk and the number in transit between Bluefield and Norfolk, and requested him to inform the railway company which of these methods of notice he preferred, and to what address notices should be sent. On the 15th of the same month McRae replied to that letter and stated that giving notice of tonnage already arrived at Lambert's Point and that en route there was preferable, and that such notice to him at Norfolk would be sufficient. This form of notice was thereafter used by the railway company in all its dealings with him, including the period in controversy. By the assignment of McRae to the bank, the railroad company was directed to deliver the coal so assigned to McRae as the bank's agent, which was done. The bank never raised any question or made any objection to the method of giving notice indicated by McRae until after its letter terminating its agreement to pay freight and demurrage charges, but recognized in its letter of November 7, 1910, and otherwise, as appears from the evidence, its liability for the demurrage charge if it proved to be just. The bank through its agent, McRae, had notice of the manner in which notice of coal shipments were given and acquiesced therein during the period the assignments were in force. The court, therefore, properly refused to give the bank's instruction "B," which declared that the demurrage sued for could not be recovered unless notice of shipments of coal was given as indicated in the instruction.

The remaining assignment of error to be considered is the refusal of the court to set aside the verdict of the jury.

The case having been, as we have seen, submitted to the jury without error on the part of the court, the only ques-

tion upon this assignment of error is, is the verdict sustained by the evidence?

It is contended by the bank that the railway company had no right to charge demurrage until the cars of coal were at Lambert's Point for the delivery of the coal into vessels. It appears that the terminal yards of the railway company extended from Lambert's Point piers to Portlock, a distance of six miles. All coal intended for Lambert's Point piers comes in at the Portlock end of the terminal and is then sent through to the piers as vessels are ready to receive it. Until coal is called for by the consignee, it remains on the terminal yards at any convenient point and demurrage is charged upon interstate shipments (as the coal in this case was) in the manner prescribed by the Interstate Commerce Commission. By rule 1 of that Commission, in force at that point, it is provided that "cars containing coal shipped to Norfolk or Lambert's Point, Virginia, *or* trans-shipment direct to vessels or to be stored for shipment by vessels, when held for or by consignors or consignees for unloading, forwarding directions, or for any other purpose, shall be subject to these rules." By rule 3 it is provided that the date of arrival of car at Norfolk terminals shall be subtracted from the date of the arrival of vessel into which it is unloaded, or from the date the car is otherwise released, and the difference between those dates will constitute the total days detention, and this difference less the free time provided for by another rule constitutes the demurrage time for which $1.00 per car is to be charged for the number of days detention beyond the free time. The evidence showed that the demurrage sued for was based upon these rules. The cars were upon the terminal yards of the railway company at Norfolk. The fact that those yards were six miles in length and the cars were located at various points on them and not actually on the pier at Lambert's Point fur-

nishes no reason why demurrage should not be paid on those cars for their detention while awaiting the convenience of the consignee or the arrival of the vessel into which they were to be loaded; for under the rules of the Interstate Commerce Commission demurrage charges ceased upon the arrival of the vessel. There is no evidence tending to show that placing the cars at various points on the terminal yards and not at Lambert's Point during the time demurrage was charged in any way prejudiced the bank.

Upon the whole case the court is of opinion that there is no error in the judgment complained of, and that it should be affirmed.

*Affirmed.*