## Wytheville.

### NORTH SHORE IMPROVEMENT CO. V. N. Y. P. & N. R. CO. AND WALKER D. HINES, DIRETOR GENERAL.

June 16, 1921.

1. CARRIERS—*Demurrage—Notice.*—The tariff filed by a carrier with the Interstate Commerce Commission does not give constructive notice of demurrage charges where the car has not yet reached its destination.

2. CARRIERS—*Demurrage—Delivery—Custom—Case at Bar.*—In the instant case, the car in question upon which defendant railroad' claimed demurrage was not consigned to Norfolk, but to a designated siding in Norfolk. Defendant claimed that it had been the custom of the railroad for a number of years to tender at Port Norfolk cars consigned to Norfolk. However, there was no sufficient evidence that this usage of the company, designated "custom," was so general as to charge the plaintiff with knowledge thereof, and he had no actual notice.

3. CARRIERS—*Demurrage—Delivery—Custom—Case at Bar.*—The existence of a usage of a railroad to tender at Port Norfolk cars consigned to Norfolk, if known to plaintiff, would not override the express provisions of a bill of lading providing that the car in question should be delivered at a designated siding in Norfolk.

4. USAGES AND CUSTOMS—*Contracts Made with Reference to Usage —Conflict Between Usage and Contract.*—Contracts not contrary to a trade usage, and which are silent on the subject of the usage, are deemed to have been made with reference to such usage, because such is the presumed intention of the parties, provided the parties have actual or imputed knowledge of the usage. But if the contract deals with the subject of the usage and conflicts therewith, the contract prevails.

5. CARRIERS—*Delivery—Demurrage.*—Where a bill of lading designates a certain side track in a city as the destination of a shipment, the delivery must be at the side track designated, and the carrier is not entitled to freight or demurrage until the shipment is delivered at such side track.

6. APPEAL AND ERROR—*Agreed Statement of Facts—Judgment of the Appellate Court.*—Where the judgment of the trial court

is set aside because the law applicable to the "facts agreed" was in favor of the plaintiff in error, the Supreme Court of Appeals will render final judgment in favor of the plaintiff in error in pursuance of section 6365 of the Code of 1919.

Error to a judgment of the Law and Chancery Court of the city of Norfolk in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Baird, White & Lanning* and *R. Clarence Dozier,* for the plaintiff in error.

*Willcox, Cooke & Willcox,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

This is an action against the N. Y. P. & N. R. R. Co. and Walker D. Hines, Director General of Railroads, to recover the value of a car load of cement and the freight paid thereon, which cement the defendants failed and refused to deliver to the plaintiff, consignee, after it had paid the freight thereon. Neither party requiring a jury, the case was tried by the court on an agreed statement of facts, and the court rendered judgment for the defendants. To that judgment the plaintiff excepted, and the case is here on a writ of error awarded by one of the judges of this court.

The facts agreed as far as they need be stated, are as follows:

"The car in question was shipped in accordance with the terms of the bill of lading offered in evidence by the plaintiff. Upon its arrival in Norfolk notice was given to the plaintiff of that fact and of the amount of freight due thereon. Subsequently the plaintiff paid the freight and

obtained the receipt therefor offered in evidence. Later in the day upon which this payment was made, the plaintiff was notified that there was demurrage due on the car, which had accrued prior to the payment of freight, and was told that this demurrage would have to be paid before it could obtain possession of the car. The plaintiff thereupon refused to pay any demurrage charges because the car had not been delivered to Colley avenue siding, the place mentioned in the bill of lading. The car was thereupon regularly stored and disposed of.

"It is further agreed that the car was never delivered or tendered at the Colley avenue siding, or any other place except Pork Norfolk, Norfolk county, Virginia, that being the place which it had been the custom of the railroad for a number of years to tender cars consigned to Norfolk. It is agreed that the president of the plaintiff company would testify that his company had only been doing business in Norfolk about eighteen months, and had no knowledge of the custom in question. That the custom is to hold cars at Port Norfolk, notify the consignee that they are held there subject to its orders, and upon payment of all proper charges, to deliver according to the orders of the consignee; * * * * * * that the liability in this case, if any, is upon the Director General, and that the Colley avenue siding is not owned by the New York, Philadelphia and Norfolk Railroad, but was at the time in question under the control of the Director General."

The bill of lading referred to shows the shipment of the cement from Coplay, Penn., over the Lehigh Valley, N. Y. P. & N., and N. & W. Railroads to North Shore Improvement Company, Colley avenue siding, Norfolk, Va. The receipt offered in evidence is dated February 6, 1919, and is for $118.50 freight, and $3.56 war tax. The receipt is on a printed form apparently intended to give notice of the arrival of goods and other information. Stamped on the

face of it is the date January 30, 1919, and "This car is held at Port Norfolk, subject to orders of consignee" and "This car will earn demurrage from 7 a. m. February 1, 1919, as follows," stating the amounts.

[1] The agreed statement of facts shows that the plaintiff had notice of the arrival of the car and the amount of freight due thereon. It does not appear how this notice was given, or that the plaintiff had any notice of when the demurrage would begin, or that any had already accrued, or that the printed receipt was ever seen by any officer or agent of the plaintiff until the freight was paid February ,6, 1919. It affirmatively appears that "later in the day upon which this payment was made, the plaintiff was notified that there was demurrage due on the car, which had accrued prior to the payment of the freight, and was told that this demurrage would have to be paid before it could obtain possession of the car," and that the plaintiff refused to pay the demurrage because the car had not been delivered to the Colley avenue siding. It thus fairly appears that at the time the freight was paid the plaintiff had no actual notice of any demand upon it for demurrage. Nor could the tariff filed with the Interstate Commerce Commission give constructive notice of demurrage charges if the car had not yet reached its destination.

[2-4] The statement of facts shows that "it has been the custom of the railroad for a number of years to tender at Port Norfolk, cars consigned to Norfolk." But the car in question was not consigned to Norfolk, but to a designated siding in Norfolk. Furthermore, there is no sufficient evidence that this usage of the company, designated "custom," was so general as to charge the plaintiff with knowledge thereof, and it does not appear that he had actual notice. The existence of the usage, however, if known to the plaintiff, would not override the express provisions of a contract in conflict therewith. Contracts not contrary

to a trade usage, and which are silent on the subject of the usage, are deemed to have been made with reference to such usage, because such is the presumed intention of the parties, provided the parties have actual or imputed knowledge of the usage. But if the contract deals with the subject of the usage and conflicts therewith, the contract prevails. Thus, if I contract for the construction of a brick wall at so much per thousand, saying nothing as to how the count is to be made, and there is a trade usage to estimate the number of bricks by allowing so many per cubic foot, I will be bound by that usage if I know of it, or if it was so general and universal that I ought to have known of it, but if I contract for the wall at so much per thousand, *actual count,* the trade usage is eliminated, and the contract fixes the method of ascertaining the number of bricks to be paid for. *Richmond* v. *Berry,* 109 Va. 274, 63 S. E. 1074. So, here, it is immaterial how general and universal the usage may have been as to cars consigned to Norfolk, or what knowledge the plaintiff may have had thereof, the usage is eliminated as a part of the agreement of the parties, because the contract of the parties (the bill of lading) called for delivery of the car at a particular siding in the city of Norfolk. The contract is in conflict with the usage, if otherwise applicable, and overrides it. "Proof of usage can only be received to show the intention or understanding of the parties in the absence of a special agreement, or to explain the terms of a written contract * * *. In all cases where evidence of usage is received, the rule must be taken with the qualification, that the evidence be not repugnant to or inconsistent with the contract." *Tilley* v. *County of Cook,* 103 U. S. 155, 162, 26 L. Ed. 374. "No usage can be incorporated into a contract which is inconsistent with the terms of that contract." *Orient M. Ins. Co.* v. *Wright,* 1 Wall. 456, 17 L. Ed. 505.

In speaking of a written contract expressed in clear and unambiguous language this court has said: "Extraneous evidence of a custom which alters or varies the terms of such a contract is, upon familar principles, inadmissible." *Sutherland* v. *Gibson,* 117 Va. 844, 845, 86 S. E. 108. To the same effect, see *Straus* v. *Fahed,* 117 Va. 633, 85 S. E. 969; *Charles Syer & Co.* v. *Lester,* 116 Va. 541, 82 S. E. 122. In *Dixon* v. *Dunham,* 14 Ill. 324, 326, it is said: "No usage or custom can be admitted to vary or control the express terms of a contract, but they may be admitted to determine that which by contract is left undetermined. The parties, by their contract, may abrogate any custom no matter how ancient or uniform, but such custom cannot abrogate the terms of the contract. Whenever there is a conflict, the contract must control." Many other cases could be added to the same effect.

Counsel for the defendant in error, in their brief, correctly state the case when they say "There is only one real question in this case: Had the car reached its destination for the purpose of demurrage when it arrived at Port Norfolk? The defendant relies only on its custom to support its contention in this case." We have already indicated plainly our answer to the question propounded and the reasons therefor, as applied to the facts of this case.

[5] In *Scovern* v. *Chicago, etc., R. Co.,* 189 Ill. App. 126 (1914), the bill of lading called for delivery of cars at "Morgan street team tracks, Chicago, Illinois." The carrier transported the cars to Chicago, and placed them on a "holding and inspection track" on its line at Western avenue in said city. The consignee refused to accept delivery at Western avenue and asked that the cars be placed on the Morgan street team tracks. The carrier insisted that the Western avenue "holding and inspection tracks" was the usual place of delivery intended by the contract of the parties; that by the rules and custom of the carrier, which

were well known to the plaintiff, Western avenue was the place of delivery for all cars consigned to the Morgan' street team tracks, and that the Western avenue tracks was the place of delivery fixed by the bill of lading which, in addition to the designation of the "Morgan street team tracks" as the place of delivery, also contained the provision that the carrier was to carry the car *"to its usual place of delivery at said destination."* The court, however, took a different view and held that where the bill of lading designates a certain side track in a city as the destination of a shipment, the delivery must be at the side track designated, and the fact that the bill of lading also contains a provision for carriage "to its usual place of delivery at said destination," and that under the rules and general customs of the company cars were delivered at a certain "holding and inspection track" two miles distant from the siding designated, does not authorize the introduction of evidence of such custom for the purpose of establishing a destination other than that named in the bill of lading. Furthermore, that a clause in a bill of lading providing for carriage "to its usual place of delivery at said destination" does not give the carrier the right by its rules and custom to change the place of destination specifically named in the bill of lading, even though the holder of the bill of lading had knowledge of the carrier's rules and custom in that respect.

In *Texas, etc., R. Co.* v. *Driskill* (1910), 61 Tex. Civ. App. 310, 128 S. W. 466, the holding of the court is well stated in the syllabus as follows:

"Where a railroad company contracts to deliver a car of lumber to the consignee in a specified part of the city, a tender of the lumber to the consignee at its station in the city is not a compliance with its undertaking, and its failure to deliver in the part of the city specified is a breach of its contract, so that a sale of the lumber for charges claimed to be due thereon was a conversion thereof which made it

liable to the shipper for its value." In this case a rehearing was asked by both plaintiff and defendant but was refused in separate opinions.

In *New York, etc., R. Co.* v. *Porter* (1915), 220 Mass, 547 108 N. E. 499, there was a consignment of coal to the private tracks of the consignee which were under the exclusive control of the carrier. The carrier refused to make such delivery until the freight was paid, and subsequently charged demurrage. The court held that "Where a shipment of coal was consigned for delivery to a coal dealer on a private track which was located on land owned by the dealer, but under exclusive control of the carrier, the carrier was not entitled to payment of freight or to demurrage until the cars had been delivered on that track." In the course of the opinion of Judge Loving it is said:

"In our opinion the question is whether the plaintiff was entitled to the freight before it had completed the transportation. It is plain that it was not. The case comes within the elementary proposition that in the absence of a special stipulation a man is not entitled to his pay until he has finished his job. See, for example, *Adams* v. *Clark*, 9 Cush. 215, 216, 217, 57 Am. Dec. 41."

In *Lee* v. *Erie R. Co.*, 173 App. Div. 75, 77, 158 N. Y. Supp. 732, it was said:

"It was a part of the implied contract duty of the defendant to place this car on the plaintiff's private track, and until it did so it had not performed its contract, and no freight or demurrage charges, although previously earned, were collectable. The contract of transportation by a common carrier includes placing the cars conveniently for loading and unloading. The incidental consignee can require the car to be placed at a convenient point for unloading and a reasonable opportunity therefor. When the consignee, as in this case, has his own track, and requires a car to be placed thereon for unloading, it is the duty of the transpor-

tation company to comply with his requirement. This was not done in the present case, nor was the car ever in a position where it could be conveniently unloaded. In *New York, etc., R. Co.* v. *General Electric Co.*, 167 App. Div. 726 at p. 732, 153 N. Y. Supp. 478, at p. 482, it was said by the court, speaking through Mr. Justice Woodward: 'We believe it may be laid down broadly that transportation by railroad of carload lots, under present day conditions, requires a convenient placing of the car for loading, and an equally convenient placing of the car for unloading and that the mere question of whether the tracks are on the property of the shipper or upon the right of way of the transportation company is of no consequence upon this point. Primarily, it is the duty of the transportation company to afford sidings, and a convenient place for loading or unloading, and a proper placing of the cars. If the shipper furnishes the siding it does not relieve the transportation company of the duty of conveniently placing the cars'."

The only cases cited for the defendant in error are not applicable to the facts of the present case. In *Swan* v. *Railroad,* 106 Tenn. 229, 61 S. W. 57, it does not appear that any particular place of delivery was specified in the bill of lading, other than the city of Nashville. The consignee insisted on delivery on a siding over which the carrier had no control, as the usual place of delivery on such shipments, and refused to pay freight or demurrage unless and until such delivery was made. The consignee was of doubtful solvency, and the court said: "The defendant company could not be required to part with the possession and control of the property until its legitimate charges were paid, and to have placed it on the plaintiff's premises, where he could unload it as he saw proper and when he pleased, was virtually to part with possession and to surrender its lien for freight and other charges," and this it was under no obligation to do. No such question is involved in the instant case,

as the agreed facts state that the delivery siding "was at the time in question under the control of the Director General," who was the carrier.

In *Citizens Bank* v. *Norfolk & W. R. Co.*, 115 Va. 45, 78 S. E. 568, the point of destination of cars of coal was Lambert's Point, and it was held that when the cars reached the Lambert's Point terminals, where such cars were usually to await the arrival of the ship which was to take on the coal, they had reached their destination, although such terminals covered a distance of six miles. Furthermore, the shipment was a foreign shipment, controlled by the rules of the Interstate Commerce Commission, which made the terminal yards aforesaid the destination and provided for the demurrage charge.

In *Berwind-White Coal Mining Co.* v. *Chicago, etc., R. Co.* 235 U. S. 371, 35 Sup. Ct. 131, 59 L. Ed. 275, a mere memorandum opinion was rendered. The facts were not very fully given. The shipments involved were carloads of coal from West Virginia to Chicago, *there to be re-consigned.* They were not shipped to any particular point in Chicago, and the fact that they were there to be re-consigned would seem to indicate that they were to be placed at such point as was usual for such re-consignment. They were so placed The memorandum opinion says:

[6] "The facts are these: The storage tracks of the railroad for cars billed to Chicago for re-consignment were at Hammond, Indiana, a considerable distance from the terminals of the company nearer the center of the city, but were convenient to the belt line by which cars could be transferred to any desired new destination, and the holding on such tracks of cars consigned as were those in question was in accordance with a practice which had existed for more than twenty years. Under these circumstances the contention is so wholly wanting in foundation as in fact to be frivolous." This decision rendered in 1914 affirms the Appellate

Court First District of the State of Illinois, which is the same court that rendered the decision in 1914, in *Scovern* v. *Chicago, etc., R. Co., supra.* We find nothing in the *Berwind-White Case* that in any way contravenes our holding in the case at bar. By the "facts agreed" it is conceded that the car never reached the destination called for in the bill of lading, and under the law the defendant in error had no right to charge demurrage thereon. The judgment of the trial court must, therefore, be set aside because the law applicable to the "facts agreed" is in favor of the plaintiff in error, and this court, in pursuance of section 6365 of the Code, will render final judgment in favor of the North Shore Improvement Company (plaintiff in error) against Walker D. Hines, Director General of Railroads of the United States (defendant in error) for the sum of $786.65 with interest thereon at *six per cent per annum* from March 1, 1919, until payment, and for the costs.

*Reversed.*