# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Southern Produce Company v. Norfolk Southern Railroad Company.

### March 18, 1926.

### Absent, West, J.

1. Carrier—*Connecting Carrier—Liability of Initial Carrier—Carmack-Cummins Amendment—Diversion or Reconsignment after Destination Reached—Case at Bar.*—In the instant case, an action under the Carmack-Cummins amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356), the goods were delivered to defendant, the initial carrier, in Norfolk county, Virginia, to be transported to the ·shipper at Edgemoor, Del. It was alleged by the shipper that Edgemoor, Del., was a diverting point on the line of the Pennsylvania railroad and well known as such to the initial carrier. Before the shipment reached Edgemoor, the shipper directed the Pennsylvania Railroad Company, to whom the initial carrier had delivered the property, to divert it to Boston, Massachusetts, and the Pennsylvania Railroad agreed to and did divert the property as directed. No new bill of lading was issued or required en route, the shipment being made throughout on the original bill of lading issued by the initial carrier, which was not surrendered. It was alleged that the property was not delivered in Boston until after the lapse of a reasonable time and damages for this delay was asked against the initial carrier. The question to be determined was whether the initial carrier was liable for damages not alleged to have occurred either upon the line of the initial carrier or upon that of any connecting carrier,, between.the point of origin and the point of delivery specified in the bill of lading issued by the initial carrier.
   *Held:* That the initial carrier was not liable.
2. Carriers—*Connecting Carrier—Liability of Initial Carrier—Carmack-Cummins Amendment—Diversion or Reconsignment after Destination Reached.*—Under the Carmack-Cummins amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356), the initial carrier can only be held liable upon its own contract, of which the bill of lading is the evidence, which it is required to issue upon receipt of property for transportation. The imposition of the liability of the initial carrier arises then out of its own bill of lading. So that, if while

the goods are upon its own line, in its own custody, the initial carrier itself diverts the shipment or changes its destination, its obligations are just as though by its original bill of lading it had contracted to transport to such substituted destination. But this cannot be true when the transportation over the line of the initial carrier has been completed, and its own contractual duty with reference thereto has been performed, if thereafter the shipper and the connecting carrier, without notice to the initial carrier, enter into another contract, verbal or written.

3. CARRIERS—*Connecting Carrier—Carmack-Cummins Amendment—Connecting Carriers Agents of Initial Carrier.*—Under the Carmack-Cummins amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356) the connecting carriers are the agents of the initial carrier, for whose negligence the initial carrier is made liable by statute only because of the contract of the initial carrier which is the bill of lading as issued or modified by the original carrier, and the connecting carrier is not the agent of the initial carrier in making a new and different contract for transportation.

4. CARRIERS — *Connecting Carriers — Carmack-Cummins Amendment—Measure of Liability of Initial Carrier.*—The liability of the initial carrier, under the Carmack-Cummins amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356), depends upon the extent of his obligation as evidenced by its own bill of lading. The initial carrier must issue a through bill of lading and becomes liable to the shipper for all damages caused by any connecting line, but this liability cannot be extended beyond the contract evidenced by the bill of lading and that is to deliver the shipment at the place of destination therein named.

5. CARRIERS—*Connecting Carriers—Carmack-Cummins Amendment—Bill of Lading—Diversion—Case at Bar.*—Under the Carmack-Cummins amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356) every carrier receiving goods for transportation is required to issue a bill of lading, and its failure to do so does not relieve it of the responsibility imposed by the standard bill of lading which is so required. In the instant case, by agreement between the connecting carrier and the shipper, the place of destination was changed, and the loss occurred between the original destination and the new destination.

*Held:* That notwithstanding no new bill of lading was issued at the place of destination, the independent contract between the shipper and the connecting carrier could not increase the liability of the initial carrier under its contract, in the absence of any notice of or participation in such reconsignment or diversion of the shipment.

6. CARRIER—*Connecting Carrier—Carmack-Cummins Amendment—Waiver of Terms of Bill of Lading.*—The parties cannot waive the terms of the bill of lading contract, nor can the carrier by its conduct give

the shipper the right to ignore these terms and hold the carrier to a different responsibility from that fixed thereby, nor can a shipper waive the stipulation of the contract any more than the carrier.

7. CARRIERS—*Diversion or Reconsignment—Connecting Carrier—Carmack-Cummins Amendment.*—A shipper can change and control the destination of his property, either by diversion or reconsignment, even after it has been delivered to a connecting carrier; he may freely interrupt the transportation, or have the shipment diverted at any intermediate point to some other destination, or have the property reconsigned when it reaches the destination originally named. This right the Carmack-Cummins Amendment (U. S. Comp. Stat, 1923 Supp., section 8604-a, page 2356) does not affect in any degree. That statute does not diminish this right of the shipper. But this right of the shipper in no degree increases the obligation imposed by that statute upon the initial carrier. They refer to different rights and obligations.

8. CARRIERS—*Connecting Carrier—Diversion—Liability of Initial Carrier.*—A diversion or change of the bill of lading of the initial carrier, while the goods are in the control or upon the ines of such carrier, modifies or extends the contract, but the exercise of this right after the shipment is in the possession of a connecting carrier, without the participation of the initial carrier, cannot affect the mutual rights of shippe and initial carrier or change their original contract.

9. CARRIERS—*Connecting Carriers—Carmack-Cummins Amendment—Conract Cannot be Varied.*—The contract of shipment—*i. e.* bill of lading—and the obligations incurred thereby and under the Carmack-Cummins Amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356) cannot be varied by the parties.

10. CARRIERS—*Connecting Carriers—Carmack-Cummins Amendment—Liability of Initial Carriers.*—It is essential, in order to recove of the initial carrier, to show that the injury is caused by some agent of the in tial carrier whom it has engaged to aid it in the performance of its contract, for that is the purpose of the statute (U. S. Comp. Stat., 1923 Supp., section 8604-a, page 2356), but its responsibility cannot be further extended so as to hold the initial carrier liable for the defaults of the shipper s own agents under other contracts to which the initial carrier is not a party.

11. CARRIER—*Connecting Carrier—Liability of Initial Carrier—Carmack-Cummins Amendment—Diversion or Reconsignment after Destination Reached—Case at Ba .*—In the instant case, an action unde the Carmack-Cummins Amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a page 2356), the goods were delivered to defendant, the nitial carrier, in Norfolk county Virginia, to be transported to the shipper at Edgemoor, Del. It was alleged by the shipper that Edgemoor, Del., was a diverting point on the line of the Pennsy.vania railroad and well known as such to the initial carrier.

Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.    425

Statement.

Before the shipment reached Edgemoor, the shipper directed the Pennsylvania Railroad Company, to whom the initial carrier had delivered the property, to divert it to Boston, Massachusetts and the Pennsylvania railroad agreed to and did divert the property as directed.

*Held:* That this in ention of the shipper to divert the shipment by instructions to the Pennsylvania railroad, though known to the initial carrier, did not impose any additional obligation upon the initial carrier, as the obligations imposed by the Carmack-Cummins Amendment are limited and controlled by the contract, the bill of lading.

12. Contracts—*Usages and Customs.*—No usage or custom can be admitted to vary or control the express terms of a contract, but they may be admitted to determine that which by the contract is left undetermined. The parties, by the contract, may abrogate any custom, no matter how ancient or uniform, but such costom cannot abrogate the terms of a contract. Whenever there is a conflict, the cont act must control.

13. Carrier—*Connecting Carrier—Liability of Initial Carrier—Carmack-Cummins Amendment—Diversion or Reconsignment after Destination Reached—Case at Bar.*—In the instant case, an action under the Carmack-Cummins Amendment (U. S. Comp. Stat., 1923 Supp., section 8604-a page 2356), the goods were delivered to defendant, the initial carrier, in Norfolk county, Virginia, to be transported to the hipper at Edgemoor, Del. It was alleged by the shipper that Edgemoor, Del., was a diverting point on the line of the Pennsylvania railroad and well known as such to the initial carrier. Before the shipment reached Edgemoor, the shipper directed the Pennsylvania Railroad Company, to whom the initial carrier had delivered the property, to divert it to Boston, Massachusetts, and the Pennsylvania Railroad agreed to and did divert the property as directed.

*Held:* That the contract of the initial carrier under its bill of lading was fully performed when the shipment reached Edgemoor, Del., and that the movement from that point to Boston, Mass., was in effect a reconsignment of the shipment under a new parol contract between the plaintiff and the Pennsylvania railroad; and that the only lawful new contract which they could have made is that which is expressed in the standard bill of lading.

Error to a judgment of the Circuit Court of the city of Portsmouth, in an action of trespass on the case. Judgment for Defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Wm. L. Parker* and *E. R. F. Wells*, for the plaintiff in error.

*Jas. G. Martin & Bro.* and *C. M. Bain*, for the defendant in error.

PRENTIS, P., delivered the opinion of the court.

This is an action brought by Southern Produce Company, a corporation, against the Norfolk Southern Railroad Company, as initial carrier, under the Carmack-Cummins amendment to the interstate commerce act (U. S. Comp. Stat., 1923 Supp., sec. 8604-a, page 2356). The action is based upon the claim that, as the receiving or initial carrier, the defendant company is responsible for loss caused by negligent delay in the delivery of an interstate shipment.

The trial court sustained a demurrer to an amended declaration and entered final judgment for the carrier, of which the plaintiff shipper is here complaining.

The declaration, in substance, alleges that on May 27, 1922, there were delivered to the carrier in Norfolk county, Virginia, to be transported to the shipper at Edgemoor, Delaware, a station on the line of a connecting carrier, 235 crates of cabbage, for which the initial carrier issued its bill of lading. It is then averred that Edgemoor, Delaware, is a diverting point on the line of the Pennsylvania railroad, and well known as such to the carrier; that the consignment was made with the intent and purpose on the part of the shipper of diverting the shipment to some other destination before it reached that point, by instructing the Pennsylvania railroad to that effect; and that this method

of shipment and diversion was in accordance with the regular custom and course of dealing between the plaintiff and the defendant in such cases; that before the shipment reached Edgemoor, the shipper directed the Pennsylvania Railroad Company, to whom the initial carrier had delivered the property, to divert it to S. J. Shallow & Co., Boston, Mass., a station on the line of a connecting carrier, and that the Pennsylvania Railroad Company agreed to and did divert the property as directed; that the freight charges were neither demanded nor paid upon the shipment until the property had arrived at Boston; that no new bill of lading was issued or required en route, the shipment being made throughout on the original bill of lading, which was not surrendered, all of which was in accordance with a custom of the shipper and in accordance with a long course of dealing between the shipper and the initial carrier; and then follows the allegation of negligence, in that the property was not delivered in Boston, Mass., until long after the lapse of a reasonable time from the date of shipment, namely, May 31, 1922, and from this delay the property was greatly injured and depreciated in value.

[1] So that the question to be determined is whether the initial carrier is liable for damages not alleged to have occurred either upon the line of the initial carrier, or upon that of any connecting carrier between Norfolk county, Virginia, the point of origin, and Edgemoor, Del., the point of delivery specified in the bill of lading issued by the carrier.

Of course, if the shipper is entitled to recover, it is by virtue of the United States statute referred to, the pertinent part of which reads thus: "Any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for

transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which said property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed."

In support of the claim for the shipper, *B. & O. R. Co. v. Montgomery & Co.*, 19 Ca. App. 29, 90 S. E. 740, is cited. The shipment there was a carload of peaches, which started at Moorefield, W. Va., and the original bill of lading issued to the shipper named Richmond as its destination, and Montgomery & Co., at Richmond, as the consignees. The consignees inspected the contents of the car at Richmond, and the opinion contains these further statements: "Upon the same date this car was delivered to the Atlantic Coast Line Railroad Company, at Richmond, Va., and was reshipped to E. B. Stewart & Co., Atlanta, Georgia, upon the original bill of lading issued by the defendant. The bill of lading issued by the Baltimore and Ohio Railroad Company was the only bill of lading issued during the transit of the shipment. It was undisputed that Montgomery & Co. were the lawful holders of this bill of lading." It is further said that "the shipment was carried from the point of origin—Moorefield,

Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.    429

Opinion.

W. Va.—to Atlanta, Ga., under one contract, the bill
of lading issued by the defendant company, and the
shipment moved under a through rate of freight from
the point of origin to Atlanta, the final destination,
as appears from the freight bill. If the defendant or its
connection had delivered the shipment at Richmond,
demanded a surrender of its bill of lading, there col-
lected the freight charges due it, and thereafter a new
bill of lading had been issued for the shipment from
Richmond, Va., to Atlanta, then there would have
been a new shipment, and the railroad issuing this
second bill of lading at Richmond would have been
the initial carrier of the shipment to Atlanta. In this
connection see *Myers* v. *Norfolk Southern R. Co.*, 171
N. C. 190, 88 S. E. 149." The conclusion upon that
state of facts was against the initial carrier. In that
case the Georgia court refuses to follow and under-
takes to distinguish the case of *Parker-Bell Lumber
Co.* v. *Great Northern Ry. Co.*, 69 Wash. 123, 124
Pac. 389, 41 L. R. A. (N. S.) 1064, which holds, upon
substantially similar facts, that where the property is
reconsigned by the consignee when it reaches the
destination named in the original bill of lading, the
initial carrier is not liable for damage or injury which
occurs in the course of transportation from its original
destination to the point to which it is reconsigned.
The distinction in the opinion of the Georgia court
seems to be based upon the fact that in the Washington
case, upon the reconsignment, a new bill of lading was
issued for the property, from the destination named
in the first bill of lading to its new destination. The
court in the Washington case held that the carrier
issuing the original bill of lading was not liable for any
damages occurring after the reconsignment.

Another case also relied on for the shipper is *Terra-*

*nova* v. *Southern Pacific Co.*, 200 N. Y. Supp. 309, 206 App. Div. 64. There a carload of grapes was shipped by the Western Fruit Company from Florin, Cal., to the California Grape Company, at Chicago, Ill., on a straight (not order) bill of lading, dated October 24, 1920. The consignee, a wholesaler, sold the grapes to the plaintiff and transferred to him the bill of lading at about the time the car reached Chicago, and while the grapes were in transit. Of this transfer the carrier (that is, the defendant, the initial carrier) was duly notified, and a diversion order was made as follows: "Consignee and destination changed to read Cal. Grape Co., advise Michael Terranova, city Syracuse, State N. Y. Route via N. Y. C." The initial carrier, Southern Pacific Company, was held liable. This case, however, presents a feature which distinguishes it from the case in judgment, in that the initial carrier, the Southern Pacific Company, itself made the diversion order while the grapes were in transit, and upon its own line. Here, on the other hand, the diversion, or reconsignment, whichever it may be properly called, was not made until after the property had passed from the control of the initial carrier and was in the possession of the delivering carrier, the Pennsylvania railroad.

[2, 3] There is no liability upon the initial carrier here, unless it is imposed by the statute. Reverting to the language of the act, it seems to us quite apparent that the initial carrier can only be held liable upon its own contract, of which the bill of lading is the evidence, which it is required to issue upon receipt of property for transportation, and, to use the language of the act itself, it is liable thereunder to the lawful holder thereof—that is of the bill of lading—for any loss, damage or injury to the property. "when trans-

ported on a through bill of lading." The imposition of the liability of the initial carrier arises then out of its own bill of lading. So that, if while the goods are upon its own line, in its own custody, as in the New York case last cited, the initial carrier itself diverts the shipment, or changes its destination, its obligations are just as though by its original bill of lading it had contracted to transport to such substituted destination. But how can this be true when the transportation over the line of the initial carrier has been completed, and its own contractual duty with reference thereto has been performed, if thereafter the shipper and the connecting carrier, without notice to the initial carrier, enter into another contract, verbal or written. The connecting carriers are the agents of the initial carrier, for whose negligence the initial carrier is made liable by statute for the transportation of the property only because of the contract of the initial carrier which is the bill of lading as issued or modified by the original carrier; but what is there in the statute, or in reason, which justifies the holding that the connecting carrier is the agent of the initial carrier in the making of a new and different contract of transportation.

[4] In addition to the *Parker-Bell Lumber Co.* v. *Great Northern Railroad Co. Case, supra*, in which the initial carrier was relieved of liability under circumstances which seem to us substantially similar to the case we are considering, we find *Beaufort Truck Growers Assn.* v. *Seaboard Air Line Ry. Co.*, 127 S. C. 496, 121 S. E. 357. There a shipment of potatoes moved by rail from Lobeco, S. C., to Toronto, Canada, over several lines of railroad. The facts are that the initial carrier, Seaboard, issued to the consignor, who was also the consignee, a bill of lading from that point to

Potomac Yards, in the State of Virginia. There was no notation upon the bill of lading, or any provision in it, showing that the shipment was expected or intended to be diverted before it reached its destination, or reconsigned afterwards, nor any evidence of any agreement to that effect binding upon the initial carrier. The plaintiff alleged that the shipment was made to Potomac Yards for reconsignment, and after it arrived reconsigned it to its own order at Buffalo, New York, and again reconsigned it from Buffalo to Toronto, Canada, to be delivered to one Simpson, to whom the shipper had sold the potatoes. The agreed facts show that from Potomac Yards the shipment was directed to Buffalo, N. Y., upon orders of the plaintiff to the agent of the Pennsylvania Railroad Company at Potomac Yards, and from Buffalo it was directed to Toronto, Canada. It is said in the opinion that the record does not show whether new bills of lading were issued by the Pennsylvania Railroad at Potomac Yards, or by the designated unnamed carrier at Buffalo, or whether it moved from Potomac Yards to Toronto upon the original bill of lading issued by the Seaboard Air Line at Lobeco, S. C. We pause in this recital to say that we cannot appreciate the suggestion that it could possibly have so moved upon the original bill of lading issued by the initial carrier, the Seaboard Air Line, at Lobeco, S. C., which was a contract for transportation only to Potomac Yards. It could not possibly have moved upon the original bill of lading first to Buffalo and then to Toronto, Canada, without some agreement or modification by the initial carrier, the Seaboard, of its original bill of lading contract. This, as we have indicated, seems to us to be a vital consideration in such controversies. The South Carolina court, in the case last cited, reversed the trial court

Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.   433

Opinion.

and held that the initial carrier was not liable for any loss or damage occurring after the shipment left Potomac Yards, and we think correctly holds that the liability of the initial carrier under the statute depends upon the extent of its obligation as evidenced by its own bill of lading.

In the case of *Parker-Bell Lumber Co. v. Great Northern Ry. Co., supra,* the pertinent facts were these:   A carload of shingles were delivered to the initial carrier for shipment from Sisco, Washington, to Nankakee, Illinois.   This carrier issued its bill of lading for the shingles and routed them over its own line of railway and then over the lines of the Chicago, Burlington and Quincy Railroad Company, the Indiana, Illinois and Iowa Railroad Company and the Chicago, Indiana and Southern Railroad Company, which together formed a continuous line of railway from Sisco, Wash., to Kankakee, Ill.   The initial carrier carried the shingles in an ordinary box car to the Minnesota Transfer Station and there delivered them to the C. B. & Q. R. Co., which road, without the knowledge of the shipper, transferred the shingles from the box car in which they had received them to two open gondola cars, and forwarded them over its own and the connecting lines to Kankakee, Ill.   After the transfer of the shingles to the C. B. & Q. R. Co., and before arrival of the cars at Kankakee, the shipper sold the shingles to the W. L. Scott Lumber Company, of Norwich, N. Y., which in turn sold them to Steenland Brothers, Palisades Park, New Jersey, and the shipper, without notice to the initial carrier, instructed the Chicago, Indiana and Southern Railroad Company, the final connecting carrier named in the bill of lading and over whose line the shingles would arrive at Kankakee, to divert them to Palisades Park, N. J.   These

434    Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.

Opinion.

instructions from the shipper were obeyed. A new bill' of lading was issued by the last named company, reciting the shipment of these two cars of shingles from appellant at Kankakee to Palisades Park, N. J., which forwarded them over a new line of connecting carriers to their destination. When the shingles arrived at Palisades Park acceptance was refused by the consignee upon the ground that they were wet and damaged. Both the lower court and the appellate court denied recovery against the Great Northern as initial carrier in this case, and it seems to us that the conclusion is perfectly sound. This, which is so applicable here, is there said: "Under its bill of lading respondent contracted to safely carry and deliver the shingles at Kankakee, Illinois. Respondent assumed no other nor further obligation. There is no evidence in the case of, nor does appellant attempt to show, the arrival of the shingles at Kankakee in a damaged condition. Its whole theory of recovery is that respondent is the initial carrier, and hence liable for any damage to the shipment en route to its destination. If it should be so held, respondent's liability is coextensive with its undertaking, and that ended with the arrival of the shingles at the destination named in its bill of lading— Kankakee, Illinois. *Allen & Gilbert-Ramaker Co.* v. *Canadian P. R. Co.*, 42 Wash. 64, 84 Pac. 620, 7 Ann. Cas. 468. The liability of respondent as initial carrier could not be extended to include the shipment from Kankakee to Palisades Park, so as to render it answerable to appellant for any damage to the shingles upon this reshipment." Proceeding further, it is said that the argument is that "the initial carrier must issue a through bill of lading, and becomes liable to the shipper for all damages caused by any connecting line. It may be so conceded. This liability, however,

Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.    435

Opinion.

cannot be extended beyond the contract evidenced by the bill of lading; and that is to deliver the shipment at the place of destination therein named. Any damage to the shingles while en route from Kankakee, Illinois, to Palisades, New Jersey, under orders from appellant and without the knowledge of respondent, under a new bill of lading, cannot be recoverable against the initial carrier in the first bill of lading, whose contract and whose liability for damages, whether occurring upon its own line or that of any connecting line, cannot be extended beyond the destination fixed in the bill of lading."

[5] For the shipper it is contended before us that this case is distinguished by the fact that there was a new bill of lading issued at Kankakee, Ill., while here there was none issued at Edgemoor; but however this may have affected the liability of any carrier who might issue such bill, how can this independent contract between the shipper and another carrier increase the liability of the initial carrier under its contract, in the absence of any notice of or participation in such reconsignment or diversion of the shipment? This brings us to remark, as applicable to the change of destination, that under the Federal statute every carrier receiving goods for transportation is required to issue a bill of lading, and its failure to do so does not relieve it of the responsibility imposed by the standard bill of lading which is so required.

This is said in *Hubbard Grocery Co.* v. *Payne,* 94 W. Va. 273, 118 S. E. 153, referring to a kindred question: "It should be understood that in determining the questions under consideration we should look, not alone to the force of the contract of shipment upon its face, but must also remember that this contract is subject to the Carmack amendment to the Hepburn

act of Congress (U. S. Comp. St., secs. 8604a, 8604aa), which vests in the Interstate Commerce Commission exclusive jurisdiction over matters pertaining to interstate shipments, with a view of establishing fixed and uniform regulations regarding such shipments. To this end it is held:

"(1) Where the carrier has failed to issue to the shipper a bill of lading, the contract set out in the standard bill of lading prescribed by the Interstate Commerce Commission will be implied as the agreement between the parties. The law was intended to operate in all cases where a carrier receives goods under an agreement, oral or written, for their transportation to another State. *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; *W. H. Aton Piano Co.* v. *Chicago, etc., R. Co.*, 152 Wis. 156, 139 N. W. 743.

[6] "(2) The parties cannot waive the terms of the bill of lading contract, nor can the carrier by its conduct give the shipper the right to ignore these terms and hold the carrier to a different responsibility from that fixed thereby." (Citing many cases.)

As Mr. Justice Hughes has said in *Ga. F. & A. R. Co.* v. *Blish Mill Co.*, 241 U. S. 190, at p. 197, 60 L. Ed. 948, 952, 36 Sup. Ct. 541, 544: "The parties could not waive the terms of the contract under which the shipment was made pursuant to the Federal Act; nor could the carrier, by its conduct, give the shipper the right to ignore these terms which were applicable to that conduct and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed."

Sou. Prod. Co. v. Nor. So. R. Co., 144 Va. 422.   437

Opinion.

Nor can a shipper waive the stipulations of such a contract any more than the carrier can.   *M. K. & T. R. Co.* v. *Ward*, 244 U. S. 383, 61 L. Ed. 1213, 37 Sup. Ct. 617.

In *Philadelphia Tapestry Mills* v. *New England Steamship Co.*, 251 Mass. 270, 146 N. E. 777, it appeared that a shipment originating in Massachusetts was destined for the plaintiff in Philadelphia, but it was consigned to the plaintiff, in the care of S. A. Mangam, in New York.   The bill of lading also had on it, "Destination, Phila., State of Pa."   The reason for this peculiar shipment was that there was at the time an embargo in New York, and the parties by agreement with Mangam, who was engaged in the trucking business in New York, agreed to expedite the shipment by consigning it to Mangam at New York, who was to receive it there and forward it to Philadelphia.   The effort there was to hold the initial carrier liable under the Carmack amendment because it was apparent that the initial carrier knew of the device to avoid the embargo; but it was held that the delivery to Mangam, the truck driver, in New York, ended the liability of the initial carrier, and that it could not be treated as a through bill of lading to Philadelphia upon which the initial carrier was responsible from the point of origin, Fall River, to Philadelphia, its ultimate destination.

[7, 8, 9] There is much reliance upon the fact that a shipper can change and control the destination of his property, either by diversion or reconsignment, even after it has been delivered to a connecting carrier; that he may freely interrupt the transportation, or have the shipment diverted, at any intermediate point, to some other destination, or have the property reconsigned when it reaches the destination originally

named.   This right must be conceded, and the Car-
mack-Cummins amendment does not affect it in any
degree and was not so intended.  This statute does not
diminish this right of the shipper, but this right of the
shipper in no degree increases the obligations imposed
by that statute upon the initial carrier.   They refer
to different rights and obligations.   A diversion or
change of the bill of lading of the initial carrier, while
the goods are in the control or upon the lines of such
carrier, modifies or extends the contract, but the
exercise of this right after the shipment is in the
possession of a connecting carrier, without the par-
ticipation of the initial carrier, cannot affect their
mutual rights or change their original contract.   That
the contract—*i. e.*, bill of lading—and the obligations
incurred thereby and under the statute, cannot be
varied by the parties, is well settled and cannot be
fairly questioned.   *Southern R. Co.* v. *Lewis, &c. Co.*,
139 Tenn. 37, 201 S. W. 131; L. R. A. 1918C, 976, and
note.

These cases from the Supreme Court of the United
States are instructive:

In *Atlantic Coast Line R. Co.* v. *Riverside Mills*,
219 U. S. 186, 55 L. Ed. 182, 31 Sup. Ct. 164, 31 L. R.
A. (N. S.) 7, Mr. Justice Lurton, in upholding the
validity of the Carmack amendment, among other
things, after emphasizing the fact that the bill of lad-
ing providing for through transportation embodies
the contract upon which the initial carrier is held
liable, says this:   "In substance Congress has said
to such carriers: 'If you receive articles for transpor-
tation from a point in one State to a place in another,
beyond your own terminal, you must do so under a
contract to transport to the place designated.  If you
are obliged to use the services of independent carriers

Sou. Prod. Co. v. Nor. So. R. Co., 144 Va. 422.  439

Opinion.

in the continuance of the transit, you must use them as your own agents, and not as agents of the shipper.' It is, therefore, not the case of making one pay the debt of another. The receiving carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although as between themselves, the company actually causing the loss may be primarily liable."

[10] It seems to us, then, manifest that it is essential, in order to recover of the initial carrier, to show that the injury is caused by some agent of the initial carrier whom it has engaged to aid it in the performance of its contract, for that is the purpose of the statute, but that its responsibility cannot be further extended so as to hold the initial carrier liable for the defaults of the shipper's own agents under other contracts to which the initial carrier is not a party.

In the case of *Pere Marquette Ry. Co. v. J. F. French & Co.*, 254 U. S. 538, 65 L. Ed. 391, 41 S. Ct. 195, the effort was to hold the initial carrier responsible for the conversion of the shipment because of an alleged improper delivery by the delivering carrier. The pertinent facts in that case are, that a carload of potatoes were delivered to the Pere Marquette Railwoy Company, as initial carrier, with the Big Four Railroad as the connecting and delivering carrier, to be transported from Bailey, Michigan, to Louisville, Kentucky. They were consigned to the shipper's order at Louisville, with a notation: "Notify Marshall & Kelsey, c/o Capt. Barnard, Commissary, Camp Taylor." When the potatoes reached Louisville they were delivered to the Southern railroad to be transported six miles to Dumesnil (Camp Taylor), upon the request of one Bindner, an agent of the Southern, whose action was ratified by Marshall & Kelsey. Thereafter

Marshall & Kelsey refused to accept the potatoes and honor the draft, and the shipper brought suit in Michigan against the Pere Marquette to recover compensation, contending that the initial carrier, because of this delivery of the car upon request, without surrender of the bill of lading, had become liable for conversion of the potatoes. There was a verdict and judgment in the Michigan courts in favor of the plaintiffs, which the Supreme Court of the United States reversed, and said: "Whatever name be used in referring to the act of forwarding the car, the Big Four, when it surrendered possession of the car to the Southern at Bindner's request, terminated its relations as carrier; just as it would have done if, at his request, it had shunted the car onto a private industrial track, or had given the control of it to a truckman on the team tracks. Having brought the goods to the destination named in the bill of lading, the carrier's only duty under its contract was to make a delivery at that place; and it could make that delivery by turning the goods over to another carrier for further carriage. Compare *Bracht v. San Antonio & A. Pass. R. Co.*, decided by this court January 3, 1921 [41 S. Ct. 150, 254 N. S., 489, 65 L. Ed. 366]; *Seaboard Air Line R. Co.* v. *Dixon*, 104 Ga. 804, 79 S. E. 1118; *Melbourne* v. *Louisville & N. R. Co.*, 88 Ala. 443, 6 So. 762. The fact that, in forwarding the car, the Big Four used the original waybill striking out the word 'Louisville' under the 'destination' and substituting 'Dumesnil, Ky. So. R. R.' is of no significance. The shipment from Louisville to Dumesnil was a wholly new transaction. In turning over the car for this new shipment, the railway made a disposal of it in assumed termination and discharge of its obligation, which was, in legal contemplation, a delivery."

Sou. Prod. Co. *v.* Nor. So. R. Co., 144 Va. 422.   441

Opinion.

[11] Here emphasis is placed by the shipper upon the fact that the declaration alleges that Edgemoor is a diverting point, which was well known to the carrier, and that shipment was made by the plaintiff to itself at Edgemoor, Del., with the intention and purpose on his part of diverting the shipment to some other destination before it reached Edgemoor, by instructing the Pennsylvania railroad to that effect, and that this custom was well known to the Norfolk Southern Railroad Company, and was in accordance with the regular course of dealing between the plaintiff and the defendant in similar cases.

[12] We think it perfectly clear that this intention of the shipper, though known to the initial carrier, does not impose any additional obligation, and that the obligations imposed by the statute are limited and controlled by the contract, the bill of lading. In the language of this court in *North Shore Imp. Co.* v. *N. Y. P. & N. R. Co.*, 130 Va. 464, 108 S. E. 11: "No usage or custom can be admitted to vary or control the express terms of a contract, but they may be admitted to determine that which by the contract is left undetermined. The parties, by the contract, may abrogate any custom, no matter how ancient or uniform, but such custom cannot abrogate the terms of a contract. Whenever there is a conflict, the contract must control." And referring to the custom which was attempted to be set up in that case, this is said: "Furthermore, there is not sufficient evidence that this usage of the company, designated 'custom,' was so general as to charge the plaintiff with knowledge thereof, and it does not appear that he had actual notice. The existence of the usage, however, if known to the plaintiff, would not override the express provisions of a contract in conflict therewith."

Then, analyzing the allegation more closely, it appears to be only an averment that there was an intention on the part of the plaintiff to divert, and that there was a custom existing between the shipper and the Pennsylvania railroad to divert or reconsign such shipments. We cannot perceive that this intent on the part of the shipper, and this course of dealing between the shipper and the Pennsylvania railroad, can remotely affect the rights of the shipper or the initial carrier, or impose any obligations except those which are so clearly fixed by the bill of lading and the Carmack-Cummins amendment. *Texas & Pac. Ry. v. Leatherwood,* 250 U. S. 478, 30 Sup. Ct. 517, 63 L. Ed. 1096; *Davis, Agt. v. Rodgers,* 139 Va. 626, 124 S. E. 408.

[13] We hold, therefore, that the contract of the initial carrier under its bill of lading was fully performed when the shipment reached Edgemoor, Del., and that the movement from that point to Boston, Mass., was in effect a reconsignment of the shipment under a new parol contract between the plaintiff and the Pennsylvania railroad. The only lawful new contract which they could have made is that which is expressed in the standard bill of lading.

*Affirmed.*