COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Decker, Judges Humphreys and Friedman
Argued by videoconference


MARKQUALL ANTWOINE CANADA

v.      Record No. 1105-21-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
AUGUST 30, 2022


FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
John T. Cook, Judge

Robert C. Goad, III, for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial on June 11, 2021, appellant, Markquall A. Canada, was convicted

of one count of possession of a firearm by a convicted felon in violation of Code § 18.2-308.2,

one count of reckless handling of a firearm in violation of Code § 18.2-56.1, and one count of

discharging of a firearm in public in violation of Altavista Code § 46-184.  Canada now appeals

and argues that the circuit court erred by admitting a recording of a 911 call over his

authentication and Confrontation Clause objections.  Canada also challenges the sufficiency of

the evidence to sustain his convictions for each of his offenses.

BACKGROUND

We view the evidence in the light most favorable to the Commonwealth, the prevailing

party below.  *Haba v. Commonwealth*, 73 Va. App. 277, 283 (2021).  On November 6, 2020,

Dezjah Watson called 911 and reported that Canada fired a shot outside her house.  Watson told

the 911 operator that Canada shot at her car.  Watson said Canada fired one shot "two minutes

ago" from a "silver and brown looking gun" that was either a ".22 or a .25."  Watson also

reported that Canada was a felon. Watson said Canada was her boyfriend, that they had broken up, and that he was upset because she had removed her tags from his car. Watson said Canada drove away from the scene in a black Audi, that had no tags on it, and that he was headed to the Quality Inn in Altavista where he had a room. Watson told the operator that no one was hurt and that there were children in her home. The 911 operator told Watson to call back if the situation changed. At one point during the call, Watson can be heard laughing.

Watson's sister, Qualissa Dale, was at Watson's home that night and saw Canada there. Canada came over to pick up a basket of clothes. He walked out of the house with the basket of clothes. After Canada left, Dale heard a gunshot outside. Dale went to the front door and saw her sister running. She saw Canada outside, and his car door was open.

In response to the 911 call, Officer Osborne and Officer Dogan arrived at Watson's residence. Officer Osborne had been to this residence about one week before November 6, 2020, and a vehicle there had been "shot up." Officer Osborne found no evidence of a bullet hitting anything and received no complaints from anyone else in the area of a gunshot. However, Officer Osborne discovered a .25 caliber shell casing on the ground. Officer Osborne then left the residence and traveled to the Quality Inn in Altavista. He then approached an Audi with no tags and looked inside through the window. A live round of ammunition was observed lying on the driver's seat.

Police obtained a search warrant and searched the Audi and the room where Canada was staying at the Quality Inn. Police found a key to the Audi on the nightstand between two beds. Next to the keys was a wallet that contained Canada's driver's license. There was also a Boston Red Sox hat that Canada was seen wearing in surveillance videos from the Quality Inn. A red backpack was also seized that contained, among other things, a few live .25 caliber rounds.

Surveillance video from the Quality Inn showed Canada in possession of the backpack when he first entered the hotel.

Police also searched the Audi and recovered the live .25 caliber round that they had first spotted through the window of the car. They also found a .25 caliber handgun in a large white hamper filled with clothes in the trunk. The gun was found under about half of the clothes, out of sight, and completely concealed.

At trial, the Commonwealth sought to introduce a recording of the 911 call along with a computer-aided dispatch document summarizing the call. To authenticate the documents, the Commonwealth called Jon Evans, the custodian of records for Campbell County Public Safety. Evans testified that the recording was a true and accurate copy of the original call. The Commonwealth also introduced a certificate of authenticity for the computer-aided dispatch document. Canada objected on the grounds that Code § 8.01-390(B) required that the recording of the phone call be accompanied by an affidavit and certificate that contained the date, time, and phone number of the call. He asserted that the certificate supplied by the Commonwealth did not include this information, but the circuit court overruled the objection, concluding that the live testimony of the custodian was sufficient to authenticate the tape.[1]

Canada also objected to the introduction of the tape on hearsay and Confrontation Clause grounds. Canada argued that Watson's statements were testimonial and that the Commonwealth was therefore required to call her to testify. The circuit court ruled that the statements were excited utterances and were nontestimonial, and overruled Canada's objections.[2]

---

[1] Although the certificate itself did not include the date, time, and phone number of the call, the computer-aided dispatch document did include this information.

[2] Canada has not assigned error to the circuit court's ruling on the hearsay objection.

After the Commonwealth rested, Canada called Watson as his witness. Watson testified equivocally to the events of the night of November 6, 2020. According to Watson, she called 911 because she was scared and was unsure what Canada would do because he wasn't talking to her. She also stated she had been drinking that day. At one point, she stated that everything she said in the 911 call was true, but also stated Canada never had a gun and never shot a gun that night. She testified that she put the gun in the clothes hamper and that Canada did not know it was there. She claimed she had put it there because she was angry that Canada had been cheating on her. However, later in her testimony she said she did not place the gun in the hamper. On redirect, she admitted to purchasing the gun herself for home defense. According to Watson, Canada only threw rocks at her car, which produced a sound like a gunshot. Further, according to Watson, what she told the 911 operator was designed to get Canada in trouble because he had hurt her emotionally. Watson discussed the case and evidence with Canada while he was incarcerated, but she testified that did not influence her testimony. On cross-examination, Watson admitted that she previously testified at a bond hearing that Canada had never been at her house on the night of November 6, 2020. She then admitted that either what she said at trial or what she said at the bond hearing was untrue. She also admitted to previously saying she had not talked to Canada about the case at the bond hearing, but on cross-examination agreed that she had. Watson also agreed on cross-examination to speaking with Canada and Canada stating that Watson should not have told anyone they had spoken, that Watson could have claimed the gun, and that Canada suggested she could still claim the gun. However, Watson never acknowledged that Canada had fired a shot.

Given Dale's statements and the later police investigation, as well as Canada's pretrial conversations with Watson, the circuit court found Watson's trial testimony incredible and credited her statements on the 911 call. The circuit court specifically noted that it "found [the

- 4 -

911 call] to be a credible call. . . . [Watson's] testimony today is inconsistent statements throughout and totally not credible . . . ." The circuit court found Canada guilty of all three charges and sentenced him to seven years' incarceration with two years suspended. This appeal followed.

## ANALYSIS

### I. The Authentication of the 911 Call

In his first assignment of error, Canada alleges that the circuit court erred in admitting the 911 call because it was not authenticated pursuant to Code § 8.01-390(B).[3] There are no published cases interpreting Code § 8.01-390(B), and this is an issue of first impression. Authentication of evidence is an evidentiary issue which this Court reviews for an abuse of discretion. *See Henderson v. Commonwealth*, 285 Va. 318, 329 (2013).

As a general rule, before evidence can be admitted in any case, the proponent bears the burden of presenting other "evidence sufficient to support a finding that the thing in question is

---

[3] Canada also asserts, for the first time, on brief that the computer-aided dispatch document was also not properly authenticated and should not have been admitted. However, Canada did not preserve this argument in the circuit court below, nor does his assignment of error identify the admission of the computer-aided dispatch document as error.

Rule 5A:18 requires that "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." For the circuit court to rule intelligently, the parties must inform the circuit court "of the precise points of objection in the minds of counsel." *Gooch v. City of Lynchburg*, 201 Va. 172, 177 (1959). Although Canada clearly objected to the authentication of the call itself, he never objected to the introduction of the computer-aided dispatch document.

Furthermore, Canada's assignment of error only identifies the introduction of the call, not the computer-aided dispatch document. "[L]itigants are required to identify with specificity the error committed by the trial court." *Findlay v. Commonwealth*, 287 Va. 111, 115 (2014). Canada's assignment of error reads: "The trial court erred in ruling that a 911 emergency service call was authenticated pursuant to Va. Code Ann. § 8.01-390 without the certificate required pursuant to Va. Code Ann. § 8.01-390(B)." This assignment of error does not sufficiently identify the introduction of the computer-aided dispatch document for appellate review.

what its proponent claims." Va. R. Evid. 2:901.[4] Virginia Rule of Evidence 2:902 also provides for a category of evidence that is so-called "self-authenticating." "Additional proof of authenticity as a condition precedent to admissibility is not required with respect to" evidence in this category. Va. R. Evid. 2:902. Relevant to this appeal, Rule 2:902(1) states that "[p]ublic records authenticated or certified as provided under a statute of the Commonwealth" fall within this category and do not require additional proof of authenticity.

One such statute is Code § 8.01-390. Code § 8.01-390 provides, in relevant part, that:

> A. Copies of records of this Commonwealth, of another state, of the United States, of another country, or of any political subdivision or agency of the same, other than those located in a clerk's office of a court, shall be received as *prima facie* evidence, provided that such copies are authenticated to be true copies either by the custodian thereof or by the person to whom the custodian reports, if they are different. A digitally certified copy of a record provided pursuant to the provisions of Chapter 38.2 (§ 2.2-3817 et seq.) of Title 2.2, whether in electronic form or in print form with visible assurance of the digital signature, shall be deemed to be authenticated by the custodian of the record unless evidence is presented to the contrary.
>
> B. Records and recordings of 911 emergency service calls shall be deemed authentic transcriptions or recordings of the original statements if they are accompanied by a certificate that meets the provisions of subsection A and the certificate contains the date and time of the incoming call and the incoming phone number, if available, associated with the call.[5]

---

[4] Of course, a finding that evidence is authentic is a necessary but not sufficient prerequisite to the admission of the evidence. A proponent of authenticated evidence must still show that the evidence complies with all of the other rules of evidence relating to relevance, hearsay, best evidence, etc. Furthermore, a finding that evidence is authentic says nothing about the weight the factfinder should attach to that evidence. The authentication inquiry is a narrow one and is only concerned with the genuineness of the offered evidence.

[5] Although Code § 8.01-390 is largely concerned with the public records hearsay exception, the plain language of the statute clearly states that evidence offered in compliance with the statute "shall be received as *prima facie* evidence." Accordingly, it is "one of the few statutes relating to document admissibility which satisfies the best evidence rule, the authentication requirement and the hearsay rule." 1 *Law of Evidence in Virginia*, § 17.4[c][2].

Accordingly, in order for a public record to be properly authenticated, the proponent of such a record would need the custodian or custodian's supervisor to appear in court and testify to the record's authenticity so that the record can be "authenticated . . . by the custodian thereof." Code § 8.01-390(A), however, goes on to provide an alternative means to authenticate these documents: if a document is a "digitally certified copy,"[6] whether in electronic or print form, it shall be "deemed to be authenticated by the custodian of the record unless evidence is presented to the contrary."

Code § 8.01-390(B) singles out 911 calls for special treatment. It specifically provides that such calls, and records of such calls, "shall be deemed authentic transcriptions or recordings of the original statements if they are accompanied by a certificate that meets the requirements of subsection A *and* the certificate contains the date and time of the incoming call and the incoming phone number." (Emphasis added). Clearly, if the proponent of a 911 call seeks to authenticate such a call solely by way of a certificate, then the proponent must include the additional information required by subsection B.[7]

Canada argues, however, that subsection B is the exclusive means of authenticating 911 calls and that live custodian testimony is not an available means of authenticating such records. We disagree. There is simply nothing in the statute that compels that conclusion. *See McGuire*

---

[6] Code § 2.2-3817 defines a "digitally certified copy" as "a copy of an electronic record created by an agency to which the agency has attached a digital signature." "[D]igital signature means an electronic sound, symbol, or process attached to or logically associated with an electronic document and executed or adopted by a person with the intent to sign the document." Code § 2.2-3817.

[7] The exhibit in question here is a three-page document that begins with a page entitled "Certificate of Authenticity" and refers to an attached "Computer Aided Dispatch Document" which contains all of the information required by Code § 8.01-390(B). The circuit court did not address, and we therefore offer no opinion on whether, the document as a whole satisfies Code § 8.01-390(B) or whether there was substantial compliance with that statute sufficient for admission of the 911 call.

*v. Atlantic Coast Line R. Co.*, 136 Va. 382, 391 (1923) ("We find no merit in the contention of the plaintiff that the tariffs admitted in evidence are not properly authenticated. It is true that they were not authenticated as required by the Virginia statute (Code 1919, § 6206); nor was this necessary. The Virginia statute . . . is not exclusive, and plaintiff's counsel recognizes that there may be an authentication under the common law rule.").

Although the statute says that such records "shall be deemed" authentic, the word "shall," in this context, does not require the proponent of the evidence to authenticate the evidence in a particular manner. In this case, the subject of the verb "shall" is the entity that is responsible for "deeming" evidence authentic, i.e., the court. In other words, the statute commands courts to rule such records are authentic if they meet the criteria of the statute regardless of whether those records would have met some other test for authentication. It imposes no mandatory command on the proponent of the evidence, but simply provides an alternative avenue to authenticate 911 calls that does not require live custodian testimony. Accordingly, the Commonwealth had the option of authenticating the call through live testimony of the custodian, by a certificate of authenticity meeting the requirements of Code § 8.01-390(B), or by any other collection of direct and circumstantial evidence that supported a finding that the call was what the Commonwealth said it was. *See* Va. R. Evid 2:901.

In this case, there is no dispute that the recording of the 911 call is a public record. Nor does Canada argue that the Commonwealth's authentication witness, Jon Evans, was not the custodian of the records. Mr. Evans testified that he was "someone who ha[d] charge, custody and control over . . . recordings of calls into the 911 dispatch system . . . in Campbell County." After a recording was played for him, Mr. Evans testified that the recording played in court was a true and accurate copy of a 911 call on November 6, 2020. This testimony complied with the authentication requirement of Code § 8.01-390(A), and the records were therefore

"self-authenticating" under Rule 2:902. Accordingly, the circuit court did not err in its authentication ruling as to the recording of the 911 call.

## II. The Confrontation Clause

Canada's second assignment of error alleges that the circuit court erred by overruling his Confrontation Clause objection to the admission of the 911 call. The Commonwealth asserts that the statements on the 911 call were nontestimonial and do not fall within the scope of the Confrontation Clause of the Sixth Amendment. We agree with the Commonwealth and hold that the statements contained in the 911 call were nontestimonial.

"Although we will not disturb on appeal decisions regarding the admissibility of evidence absent an abuse of the trial court's discretion, we review *de novo* whether a particular category of proffered evidence is 'testimonial hearsay.'" *Holloman v. Commonwealth*, 65 Va. App. 147, 170 (2015) (quoting *Caison v. Commonwealth*, 52 Va. App. 423, 434 (2008) (citations omitted)). "In conducting our *de novo* review, however, we are 'bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them.'" *Pulley v. Commonwealth*, 74 Va. App. 104, 122 (2021) (quoting *Cody v. Commonwealth*, 68 Va. App. 638, 656 (2018)).

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Court continued, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. Accordingly, the

Confrontation Clause only prohibits the introduction of so-called "testimonial" statements of a witness who is not made available for cross-examination.

In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Court explained what statements qualified as "testimonial" and articulated the primary purpose test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

The Court then considered four major factors to determine the existence of an ongoing emergency:

> 1) Was the declarant speaking about current events as they were actually happening, "requiring police assistance" rather than describing past events?
>
> (2) Would a "reasonable listener" conclude that the declarant was facing an ongoing emergency that called for immediate help?
>
> (3) Was the nature of what was asked and answered during the course of a 911 call such that, "viewed objectively, the elicited statements were necessary to be able to resolve the present emergency" rather than "simply to learn . . . what had happened in the past?"
>
> (4) What was the "level of formality" of the interview? For example, was the caller frantic, in an environment that was neither tranquil nor safe?

*See id.* at 827.

However, in *Michigan v. Bryant*, 562 U.S. 344, 369 (2011), the Court clarified that the primary purpose inquiry must consider "all of the relevant circumstances." The Court reiterated that where the primary purpose of "an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation]

Clause." *Id.* at 377. The Court noted, however, that "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 366.

In *Cody*, 68 Va. App. at 660, this Court held that a 911 call was nontestimonial when "[e]xamining all of the relevant circumstances, including the circuit court's findings of fact regarding [the declarant's] demeanor and state of mind, . . . [the] statements to the emergency dispatcher were not made 'with a primary purpose of creating an out-of-court substitute for trial testimony.'" The 911 caller in that case was calling from the local sheriff's office following an incident of domestic abuse. *Id.* This Court reasoned that the declarant

> was neither acting as a witness, nor was she testifying. The recording of the call reveals no interrogation by the emergency dispatcher of [the caller] for the primary purpose of prosecution. Rather, the emergency dispatcher was simply eliciting identifying and other information to determine the nature and type of emergency from a caller claiming to be a victim of an assault, including, her name and address, the nature of any injuries, and whether or not [the caller] and her children were in a safe location. Further, the fact that [the caller] was audibly frightened, anxious, and provided vague details is what prompted additional inquiry by the emergency dispatcher. The mere fact that [the caller] identified Cody as the person who assaulted her during the call does not alter the fact that the primary purpose of [the caller's] statements to the emergency dispatcher was to seek help and safety for herself and her children because she "didn't know what do."

*Id.* In the wake of *Bryant* and *Cody*, it is clear that although the *Davis* factors remain relevant to the primary purpose inquiry, courts should consider the totality of the circumstances when determining whether out-of-court statements are nontestimonial.

Canada contends that the 911 call in his case is analogous to the call in *Wilder v. Commonwealth*, 55 Va. App. 579 (2010). In that case, the declarant was calling to report a larceny in progress. The Court noted that the caller was not "call[ing] for help against a bona fide physical threat." *Id.* at 591 (quoting *Davis*, 547 U.S. at 827). The declarant acknowledged

- 11 -

during the call that the defendants did not see him.  *Id.*  Nor was there evidence in the record suggesting that the actions of the defendants represented a danger to others.  *Id.*  Although the declarant was describing events "as they were actually happening," the facts in the record did not demonstrate that he "fac[ed] an ongoing emergency that called for help."  *Id.* (citing *United States v. Cadieux*, 500 F.3d 37, 41 (1st Cir. 2007)).  The Court noted that the facts and circumstances of every nontestimonial 911 call case indicated an immediate or imminent danger to the declarant, a third person, or the public generally.  *Id.* at 591-92.

*Wilder* distinguished *United States v. Proctor*, 505 F.3d 366 (5th Cir. 2007).  There, the defendant's brother called 911 to report that the defendant had taken a gun from his car, fired it into the ground, and then fled into a nearby nightclub.  *Proctor*, 505 F.3d at 368.  During the call, the brother indicated that the defendant was a convicted felon, who was possibly high on cocaine.  *Id.* at 372.  At trial, a recording of the 911 call was admitted into evidence over the defendant's objection.  *Id.* at 369.  The Fifth Circuit held that the 911 recording was nontestimonial and affirmed the defendant's convictions.  *Id.* at 371.  The court found that an armed, potentially dangerous felon, possibly high on cocaine, who ran into a nightclub constituted an ongoing emergency that required police assistance.  *Id.* at 371-72.  As the court noted, the caller "could have reasonably feared that the people inside the nightclub were in danger."  *Id.* at 372.

Finally, *Wilder* distinguished *Cadieux*.  There, the defendant, who was extremely intoxicated, brandished a shotgun during an argument with his girlfriend.  *Cadieux*, 500 F.3d at 38.  When the girlfriend's daughter returned home, she became concerned and called 911.  *Id.*  Eventually, the police arrived and apprehended the defendant, who happened to be a convicted felon.  *Id.* at 39.  At trial, a recording of the 911 call was admitted into evidence over the defendant's objection.  *Id.* at 40.  On appeal, the First Circuit held that the recording was

nontestimonial. *Id.* at 42. The court recognized that "[t]he emergency did not end until Cadieux was apprehended . . . ." *Id.* at 41. Furthermore, the court noted that the caller was "hysterical as she sp[oke] to the dispatcher, in an environment that [was] neither tranquil nor, as far as the dispatcher could reasonably tell, safe." *Id.*

The totality of the circumstances in this case makes clear that the primary purpose for the out-of-court statements was not to create a substitute for trial testimony. The evidence established that Canada was upset, was a felon and therefore prohibited from possessing a firearm, and that he had already shot the gun once in a dangerous and reckless manner. The questions from the 911 operator, and Watson's responses, were geared towards finding and disarming Canada so that there would be no further harm. At the time of the call, Canada's precise location and intentions were unknown, and Watson believed that he was armed with a weapon. Unlike the larceny in *Wilder*, the crime in this case presented a threat of physical harm to both Watson and potential bystanders including the children in Watson's home. Furthermore, just as was the case in *Cadieux*, even though Canada was not immediately threatening Watson, the "emergency did not end until [Canada] was apprehended . . . ." *Id.*

Additionally, the four *Davis* factors also weigh in favor of a conclusion that the primary purpose of the 911 call was to obtain assistance for an ongoing emergency. First, Watson was making the call a mere two minutes after the shot was fired. This indicates that Watson was describing current events and required immediate assistance. Second, a reasonable listener would conclude that someone in Watson's position would require immediate assistance. Although Watson stated that Canada left in his car to go to the Quality Inn, the possibility remained that Canada would return to the home (as evidenced, in part, by the 911 operator instructing Watson to call back if the situation changed). The fact that Watson laughed on the call does not change this conclusion; a person might laugh as a response to many different

emotional states: stress, joy, contempt, disbelief, etc. Third, when viewed objectively, the questions that were asked and answered during the call "were necessary to be able to resolve the present emergency." The questions by the 911 operator were designed to determine Canada's location, the sort of weapon involved, how many shots were fired, whether anyone or anything was hit by the shot, and the level of danger posed by Canada (e.g., his status as a felon and the motive for the incident). Finally, this was not a controlled environment akin to police interrogation or trial testimony. Watson was calling 911 from her home mere minutes after a domestic incident.

The fact that Watson later disclaimed her statements on the 911 call is of no moment. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009). This Court gives "deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Id.* Thus, this Court must accept "the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 70-71 (1999)). The circuit court explicitly rejected Watson's trial testimony that she fabricated her story in order to get Canada in trouble.

Watson's statements were nontestimonial and did not fall within the scope of the Confrontation Clause. As such, the circuit court did not err in overruling Canada's objection to the introduction of the 911 call on Confrontation Clause grounds.[8]

### III. The Sufficiency of the Evidence

Canada also asserts that the evidence was insufficient to convict him of the three firearm crimes. A reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (citation omitted)). Instead, this Court only asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 319). A trial court's judgment should not be reversed on appeal unless it is "plainly wrong or without evidence to support it." *Preston v. Commonwealth*, 281 Va. 52, 57 (2011). "[W]hen assessing the sufficiency of the evidence on appeal, '[this Court] considers all admitted evidence, including illegally admitted evidence.'" *Sprouse v. Commonwealth*, 53 Va. App. 488, 493 (2009) (quoting *Hargraves v. Commonwealth*, 37 Va. App. 299, 312-13 (2002)).

Canada was convicted of being a felon in possession of a firearm, in violation of Code § 18.2-308.2, and two misdemeanor firearm offenses.[9] The only element that Canada argues the Commonwealth failed to prove was that he ever possessed the firearm. Watson's statements on the 911 call, corroborated by the subsequent police investigation and the testimony of her sister

---

[8] "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). Because we hold that Watson's statements on the 911 call are nontestimonial and therefore outside of the reach of the Confrontation Clause, we do not decide whether Canada's Confrontation Clause rights were satisfied by calling Watson as his own witness and impeaching her statements in the 911 call.

[9] Reckless handling of a firearm, in violation of Code § 18.2-56.1, and discharging a firearm in a public place, in violation of Altavista Code § 46-184.

Ms. Dale, clearly support a finding that Canada possessed the firearm when he fired it towards her car. The evidence was sufficient to convict Canada of the firearm charges in this case.

CONCLUSION

Because Code § 8.01-390(B) is not the exclusive means of authenticating 911 records and the Commonwealth validly authenticated the call under Code § 8.01-390(A), we find no error in the circuit court's evidentiary ruling on the authentication of the 911 call. Furthermore, Watson's statements were nontestimonial and therefore not within the scope of the Confrontation Clause and the circuit court did not err in admitting those statements. Finally, because there was evidence in the record to support the fact that Canada possessed the firearm in this case, we affirm his convictions.

*Affirmed*.